HENRY J. TULLY AND CAROLINE P. TULLY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56340. Filed April 30, 1957.

*Albert Krassner, Esq.*, for the petitioners.
*Emil Sebetic, Esq.*, for the respondent.

### OPINION.

ARUNDELL, *Judge:* The respondent determined a deficiency in income tax for the taxable year ended December 31, 1948, in the amount of $10,963.74.

The only issue remaining is whether $31,000 received by petitioner Henry J. Tully, in 1948, was ordinary income as determined by respondent or capital gain as reported by petitioner.

Two other minor issues were raised but have been abandoned.

The facts relative to the remaining issue were stipulated. Only those deemed necessary for our consideration of this issue need be stated here.

Petitioners are individuals, husband and wife, who reside at Long Island, New York. The return for the taxable year ended December 31, 1948, was filed with the then collector of internal revenue for the first district of New York. Petitioner Caroline P. Tully is involved herein only because she filed a joint return with her husband, Henry J. Tully, who will hereinafter sometimes be referred to as petitioner.

At the relevant times herein, Lincoln Underwear Mills Inc., hereinafter referred to as Lincoln, was a New York corporation, having offices in the borough of Pottstown, Montgomery County, Pennsylvania. For several years prior to September 20, 1947, Lincoln had authorized, issued, and outstanding 305 shares of common stock which were owned as follows: Henry J. Tully, 100 shares; Carson C. Potter,

100 shares; Paul Polsky, 100 shares, and Joseph Greenberg, 5 shares.

Petitioner, Potter, and Polsky were all actively engaged in the management and operation of Lincoln during several years prior and up to September 20, 1947. They were the officers and directors of Lincoln during this period.

Sometime prior to September 20, 1947, friction had arisen among petitioner, Potter, and Polsky as to the proper management and operation of Lincoln. Polsky, at or about September 20, 1947, was unwilling to continue as a minority stockholder under the condition of friction then existing among petitioner, Potter, and Polsky. Polsky therefore offered to sell his 100 shares of common stock to either petitioner, Potter, or Lincoln. Alternatively, Polsky offered to buy the 100 shares of common stock owned by either petitioner or Potter. The result of such purchase or sale by Polsky would have been to vest control of Lincoln in Polsky, if he bought; in petitioner, if he bought; in Potter, if he bought; and in neither petitioner nor Potter if the corporation bought.

Petitioner was willing to sell his 100 shares of stock to Polsky. Potter was neither willing to sell his 100 shares to Polsky nor was he willing to buy Polsky's 100 shares. Potter did not want any one individual, other than himself, to acquire stock ownership control of Lincoln.

In order to forestall any sale by petitioner of his shares to Polsky and in order for Potter to achieve his objective of preventing any individual, other than Potter, from acquiring stock ownership control of Lincoln, Potter and his wife, Ethel L. Potter, sometimes referred to herein as the Potters, parties of the first part, and petitioner, party of the second part, made and executed a certain instrument on September 20, 1947. The said instrument, after reciting in several "Whereas" clauses the facts heretofore stated, continued as follows:

WHEREAS, said CARSON C. POTTER and ETHEL L. POTTER, his wife, are the owners of the building, occupied by the Corporation * * * having acquired title to the same at a cost of $44,000.00; and

WHEREAS to induce said HENRY J. TULLY to decline the POLSKY offer and to retain his present stockholdings the said CARSON C. POTTER and ETHEL L. POTTER, have offered said HENRY J. TULLY a one-half (½) interest in the said building and premises * * * over and above the amounts invested by said CARSON C. POTTER and ETHEL L. POTTER, in the purchase of said building plus a fair profit based on the increase in value of the premises, since the date of such purchase; and

WHEREAS, the parties to this Agreement, have agreed that the sum of $88,-000.00 would constitute a fair return to said CARSON C. POTTER and ETHEL L. POTTER, for their investment in purchasing said building and its subsequent increase in value.

NOW THEREFORE, IT HAS BEEN MUTUALLY AGREED BY PARTIES HERETO AS FOLLOWS:—

1. The said HENRY J. TULLY will not sell, transfer, assign or otherwise dispose of his stock in LINCOLN UNDERWEAR MILLS INC. to the said PAUL

POLSKY or to any member of the family of said PAUL POLSKY; and if said PAUL POLSKY should sell his stock to a person, not now a stockholder, the said HENRY J. TULLY will not sell his stock to such person for a period of five (5) years from the date of the Agreement. * * *

2. In consideration thereof, the said CARSON C. POTTER and ETHEL L. POTTER, do hereby assign, transfer and convey to the said HENRY J. TULLY, an undivided one-half (½) interest in the building and premises now occupied by the Corporation and located at Water and Evans Streets, Pottstown, Pennsylvania, which one-half interest shall be subject, however, to a prior interest of said CARSON C. POTTER and ETHEL L. POTTER to the extent of $88,000.00. As a consequence, the interests of the respective parties to this Agreement in said building and premises shall be as follows: CARSON C. POTTER and ETHEL L. POTTER, parties of the first part herein, are and shall remain the owners of the first $88,000.00 of the value thereof; the said CARSON C. POTTER and ETHEL L. POTTER shall own a one-half (½) interest in said building over and above the first $88,000.00 of value thereof; and the said HENRY J. TULLY shall own the remaining one-half (½) interest in said building over and above the first $88,000.00 of value thereof;

\*     \*     \*     \*     \*     \*     \*

This Agreement shall be binding upon the parties hereto, their heirs, executors and legal representatives.

Between September 20 and September 30, 1947, Lincoln redeemed Polsky's 100 shares of its common stock for $150,000 leaving outstanding through 1948, 205 shares of common stock of Lincoln.

On or about September 15, 1948, the land and building, which were the subject matter of the said instrument executed on September 20, 1947, were conveyed, by bargain and sale deed, with covenants against grantors' acts, by the Potters to Lincoln for the sale price of $150,000.

The sale price of $150,000 was paid on September 15, 1948, by Lincoln to the Potters and on the same day the Potters paid to petitioner the sum of $31,000, being one-half of $62,000, the difference between $88,000 and $150,000.

On petitioners' joint return for the year 1948, petitioner reported the receipt of the $31,000 as a long-term capital gain.

In a statement attached to the deficiency notice, the respondent adjusted the net income reported by petitioners by adding thereto "(a) Gain from sale of asset $31,000.00" and explained his adjustment as follows:

(a) It is held that the $31,000.00 received by you in 1948 from Carlson [sic] C. Potter and Ethel E. [sic] Potter is ordinary income and not capital gain as reported by you on your return.

The material provisions of section 117 of the Internal Revenue Code of 1939 provide as follows:

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * [exclusions not applicable].

\*     \*     \*     \*     \*     \*     \*

(4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income;

The contention of the petitioners is that petitioner owned an interest in the land and building, which interest was a capital asset, and that the $31,000 received by petitioner in 1948 from the Potters represented the proceeds of sale of said interest, which, having been held for more than 6 months, gave rise to a long-term capital gain.

The respondent contends, first, that petitioner did not acquire any interest in the land and building which constituted a capital asset; alternatively, respondent contends that if petitioner did in fact acquire an interest in the land which was in fact sold or exchanged, there was a constructive dividend to him from the corporation.

The respondent in his brief says:

Admittedly, if petitioner did, in fact, acquire an undivided interest in the Potter property by virtue of the 1947 agreement not to sell, such interest would be deemed a capital asset within the meaning of section 117, and accordingly could qualify as a sale of such an asset within the meaning of section 117.

We think the 1947 agreement between petitioner and the Potters makes it crystal clear that petitioner "did, in fact, acquire an undivided interest in the Potter property." The agreement specifically so provides. The plain language is that, in consideration of petitioner's promise not to sell his stock, the Potters "do hereby assign, transfer and convey to the said HENRY J. TULLY, an undivided one-half (½) interest in the building and premises," which one-half interest shall be subject, however, to a prior interest of the Potters to the extent of $88,000. The agreement was made binding upon the parties thereto, their heirs, executors, and legal representatives. Paragraph 6 of the agreement also provided:

The interest in the building and property acquired by the said HENRY J. TULLY, under the terms of this Agreement, is in no way dependent upon his future stock ownership; and if said HENRY J. TULLY, shall hereafter dispose of his stock, it shall in no way reduce or diminish the interest which he hereby acquires in the building and premises hereinabove described. [Emphasis added.]

We think the above assignment, transfer, and conveyance from the Potters to petitioner, as a matter of law, vested petitioner with a definitive interest in the building and premises concerned. The property interest so acquired continued to be vested in petitioner, his heirs, and assigns until such time as the property was sold and petitioner received his share of the selling price in excess of $88,000.

The respondent argues that petitioner's promise not to sell envisions a continuing personal obligation and that as a practical matter Potter would not dispose of the property and pay anything to petitioner until he was sure petitioner could no longer transfer control of Lincoln to Polsky. If there be any merit in this argument, it would be moot

for the reason that the so-called contingencies referred to were short-lived in that under the facts here stipulated sometime before September 30, 1947, Lincoln redeemed Polsky's 100 shares of stock for $150,000. Therefore, after September 30, 1947, petitioner could no longer have transferred control of Lincoln to Polsky and in consideration of his forbearance to do so he had definitely acquired an interest in the Potter property. This interest represented "property held by the taxpayer" and was clearly a capital asset as that term is defined in section 117 (a) (1), *supra.*

More than 6 months later petitioner, in connection with the sale of the Potter property to Lincoln, exchanged his interest therein for $31,000. We hold that the gain resulting therefrom was a "long-term capital gain" as that term is defined in section 117 (a) (4), *supra. Louis W. Ray,* 18 T. C. 438, affd. (C. A. 5) 210 F. 2d 390, certiorari denied 348 U. S. 829. The case of *Merton E. Farr,* 11 T. C. 552, affirmed sub nom. *Sloane* v. *Commissioner,* (C. A. 6) 188 F. 2d 254, particularly relied upon by respondent, is distinguished on its facts. The Sixth Circuit in that case said "No interest in the Wyandotte property was conveyed to petitioner by the assignment, which merely provided that if the property should be sold at a price in excess of a certain amount, such excess would be paid to him as compensation for services."

We hold, further, there is no merit in respondent's alternative contention that the $31,000 represented a constructive dividend. This contention is in reality a new issue not contained in the pleadings. Cf. *Sicanoff Vegetable Oil Corporation,* 27 T. C. 1056. In the statement attached to the deficiency notice, the respondent labeled the $31,000 as "[g]ain from sale of asset." Even if we were to consider the matter as properly before us, there is no evidence in the record to show that the selling price of $150,000 was not the fair market value of the property at that time.

We hold, therefore, that, based on the facts in this proceeding, the $31,000 received by petitioner in 1948 is taxable as long-term capital gain rather than ordinary income. *Louis W. Ray, supra.*

*Decision will be entered under Rule 50.*