Jack O. CHERTKOF and Sophie
Chertkof, Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

No. 80–1221.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 2, 1980.

Decided May 21, 1981.

Richard E. Levine, Baltimore, Md. (Theodore W. Hirsh, Miles & Stockbridge, Baltimore, Md., on brief), for appellants.

Kristina E. Harrigan, Tax Division, Dept. of Justice (Michael L. Paup, Jonathan S. Cohen, Tax Division, Dept. of Justice, M. Carr Ferguson, Asst. Atty. Gen., Washington, D. C., on brief), for appellee.

Before WINTER, SPROUSE and ERVIN, Circuit Judges.

SPROUSE, Circuit Judge:

This is an appeal by Jack O. Chertkof ("Taxpayer") and Sophie Chertkof, his wife

(jointly "Taxpayers"), from a decision of the United States Tax Court finding that they are liable for the tax on a corporate distribution in redemption of shares of stock at ordinary income rates.

The Taxpayer, his father, David W. Chertkof, and W. J. Smith organized the E & T Realty Company in 1941, which constructed, owned and operated the Essex Shopping Center, a complex of retail stores in Baltimore County, Maryland. Taxpayer owned 20 percent of E & T's stock; his father and Smith each owned 40 percent. The latter two ran E & T until Smith's death in 1947, after which Smith's stock was retired and Taxpayer owned one-third and his father two-thirds of the stock.

Taxpayer's father controlled and managed E & T. Taxpayer disagreed with his father about the management of the shopping areas, but could not find a satisfactory buyer for either his one-third interest in E & T or E & T as a whole. Taxpayer agreed with his father, therefore, that E & T would redeem Taxpayer's shares, leaving his father as sole owner.

E & T and Taxpayer signed a redemption agreement dated July 12, 1965, under which Taxpayer received an undivided one-third interest in E & T's assets, including the shopping areas, subject to liabilities. He, in turn, agreed to surrender all his E & T stock. The redemption agreement reserved to E & T the right to supervise, administer, manage, sell, or refinance all of the shopping areas, including Taxpayer's one-third interest; Taxpayer would receive one-third of the annual profits on the properties and pay a management fee.

Taxpayer obtained a private letter ruling from the Internal Revenue Service that this redemption distribution would qualify for capital gains treatment.

On February 28, 1966, Taxpayer surrendered all of his stock in E & T and received a one-third undivided interest in E & T's assets. At a meeting of the stockholders one week earlier, Taxpayer had ceased to be an officer, director and employee of E & T.

In June or July, 1966, Harold Sweeten, attorney for Taxpayer's father and an officer and director of E & T, asked Taxpayer to take over management of the shopping areas from E & T because David Chertkof's ill health impaired E & T's performance. In August 1966 a management agreement was executed between E & T and Taxpayer, as joint owners of the shopping areas, and a corporation, J. O. Chertkof Co., under the terms of which Chertkof Co. was to manage the properties. Taxpayer owned 80 percent of the Chertkof Co. stock and was its president. Taxpayer's wife and children owned the remaining 20 percent of the stock. The management agreement gave Chertkof Co. exclusive power, *inter alia*, to determine rents, to negotiate and execute all leases, and to set aside money as it saw fit for repairs, maintenance and insurance. This agreement was not terminable for the two years following September 1, 1966, and thereafter could be terminated only on an annual date with ninety days prior notice. Chertkof Co.'s fee was below customary rates for similar maintenance contracts, and did not include a charge for Taxpayer's services.

Taxpayer filed a timely tax return for tax year 1966; he included the distribution from E & T, which he valued at $167,027.56, treated it as a distribution qualifying for capital gains treatment and paid tax based on this value. He also filed an agreement that he would not acquire any interest in E & T, including an interest as an officer, director or employee, for ten years after the redemption, as required by section 302(c)(2)(A)(iii) of the Internal Revenue Code.[1]

After an audit, the Commissioner of Internal Revenue on April 11, 1969, issued a

---

1. Taxpayer's asserted ground for capital gains treatment was under 26 U.S.C. § 302(b)(3)— "complete redemption of all the stock of the corporation owned by the shareholder." In determining the ownership of stock for purposes of this section, however, the family attribution rules contained in 26 U.S.C. § 318 apply, under which Taxpayer would be considered to own the stock owned by his father, unless he waived these rules by fulfilling the requirements set out in 26 U.S.C. § 302(c)(2)(A).

statutory notice of deficiency of $191,350.46 for the tax year 1965. He ruled that the stock redemption distribution should have been reported in 1965 as dividend income, not as a capital gain and valued the distribution at $348,258.00. He also determined that there had been an overpayment for 1966 because Taxpayer had reported and paid an inapplicable capital gains tax on the distribution in that year.

Taxpayers paid the assessed deficiency for 1965 on August 25, 1966, and on April 7, 1970, filed a suit seeking its refund. In the meantime the Commissioner voluntarily refunded to Taxpayers the capital gains tax paid for 1966. On November 14, 1973, the district court held that the correct taxable year for the redemption was 1966, not 1965, and entered judgment in favor of the Taxpayers in their refund suit, *Perma-Rock Products, Inc. v. United States*, 373 F.Supp. 159 (D.Md.1973). The appeal from the district court judgment was dismissed on the Commissioner's motion on February 19, 1974, and Taxpayers received a refund of the 1965 deficiency on April 8, 1974.

The Commissioner issued a deficiency notice for the taxable year 1966 on December 8, 1974, in which he again treated the stock redemption distribution as ordinary dividend income and calculated the tax as $229,390.71.

Shortly thereafter, the Taxpayers petitioned the Tax Court for a redetermination of this deficiency and moved for summary judgment on the basis that the statute of limitations on assessments for 1966 had expired [2] and that the mitigation provisions, 26 U.S.C. §§ 1311–14, were not applicable. The Tax Court, adopting the position of the Commissioner that the mitigation provisions were applicable, denied the motion. 66 T.C. 496 (1976).

After a trial on the merits, the Tax Court held (1) the value of the corporate distribution was $320,488.61; and (2) the distribution was taxable as ordinary income. 72 T.C. 1113 (1979).

The Taxpayers contend the trial court erred in denying their motion for summary judgment based on the statute of limitations and in its ruling that the distribution for stock redemption was taxable as ordinary income.

## I.

Taxpayers' first contention is that, since it was the Commissioner and not they who erroneously determined the tax was due in 1965, and since their position has never been inconsistent with the conclusion reached in *Perma-Rock* that 1966 was the proper tax year, the mitigation provisions do not apply and the deficiency assessed in 1974 for the taxable year 1966 is barred by the statute of limitations. Taxpayers correctly assert that the deficiency assessment for 1966 would have been time-barred after April 15, 1970, unless kept alive by the mitigation provisions of 26 U.S.C. §§ 1311–1314. We agree with the Tax Court, however, that the mitigation provisions do apply and, therefore, that the Commissioner's action is not barred by the normal statute of limitations.

Section 1311 provides in pertinent part:

(a) General Rule.—If a determination (as defined in section 1313) is described in one or more of the paragraphs of section 1312 and, on the date of the determination, correction of the effect of the error referred to in the applicable paragraph of section 1312 is prevented by the operation of any law or rule of law, other than this part and other than section 7122 (relating to compromises), then the effect of the error shall be corrected by an adjustment made in the amount and in the manner specified in section 1314.

(b) Conditions necessary for adjustment.—

(1) Maintenance of an inconsistent position.—Except in cases described in paragraphs (3) (B) and (4) of section 1312, an adjustment shall be made under this part only if—

---

**2.** The statute of limitations on assessment of tax for the year 1966 expired on April 15, 1970. 26 U.S.C. § 6501.

(A)...

(B) in case the amount of the adjustment would be assessed and collected in the same manner as a deficiency under section 1314, there is adopted in the determination a position maintained by the taxpayer with respect to whom the determination is made,

and the position maintained ... by the taxpayer in the case described in subparagraph (B) is inconsistent with the erroneous inclusion, exclusion, omission, allowance, disallowance, recognition, or nonrecognition, as the case may be.

Section 1312 provides in pertinent part:

The circumstances under which the adjustment provided in section 1311 is authorized are as follows: ...

(3) Double exclusion of an item of gross income.—

(A) Items included in income.—The determination requires the exclusion from gross income of an item included in a return filed by the taxpayer or with respect to which tax was paid and which was erroneously excluded or omitted from the gross income of the taxpayer for another taxable year, or from the gross income of a related taxpayer ....

As the Tax Court rightly concluded, application of the mitigation provisions is conditioned on the following:

1. There must have been an error in a tax year now closed (i. e., 1966). Section 1311(a).

2. There must have been a "determination" under section 1313(a) with respect to the item giving rise to the error for some other year (i. e., 1965).

3. The error must have been of a kind specified in section 1312; i. e., one of the "circumstances of adjustment" enumerated in section 1312 must have occurred.

4. The party who prevailed in said "determination" must have maintained a position inconsistent with the erroneous treatment. Section 1311(b).

It is undisputed that the first two conditions have been satisfied. The refund by the Commissioner of the tax payment tendered for 1966 erroneously excluded the redemption payment from Taxpayers' income for that year. The judgment of the district court holding the payment to have been income in 1966 and not in 1965 was a "determination" within the meaning of 1313(a)(1). The Commissioner relies on 1312(3)(A) as outlining the "circumstances of adjustment" required to satisfy the third condition; this requires a previous erroneous exclusion of the item involved in the determination from Taxpayers' income in another taxable year. It is Taxpayers' position that 1312(3)(A) requires the error to have been committed by the party who seeks to avoid the application of the mitigation provisions. Taxpayers also contend it was the Commissioner, not they, who took the inconsistent position. They point out that their initial position that the tax was payable in 1966 was consistent with the holding of the district court and was inconsistent with the initial determination of the IRS.

Taxpayers misconceive the meaning of both aspects of the statute. It was not congressional intent, in enacting the mitigation provisions, to benefit either the Commissioner or the taxpayer to the exclusion of the other. The basic purpose of the mitigation provisions is to permit the correction of an earlier decision which is determined to be erroneous in a subsequent administrative or judicial action; the intent is that the correct tax be paid or the correct deductions be allowed, not that a windfall be provided to either the taxpayer or the government on a gamesmanship theory of "fault."

We cannot read into section 1312(3)(A) a requirement that Taxpayers must have erred; not only does the statutory language indicate otherwise but legislative history points to a contrary congressional intent. Likewise, there is no requirement that the party who benefits from the application of the statute of limitations must have maintained a position inconsistent with that which it initially advanced. It is only nec-

essary that the position adopted in the determination be inconsistent with the exclusion or deduction in another year.

The Senate Report accompanying the Revenue Bill of 1938 stated with respect to section 819: [3]

In each [of the examples], under existing law, an unfair benefit would have been obtained by assuming an inconsistent position and then taking shelter behind the protective barrier of the statute of limitations. Such resort to the statute of limitations is a plain misuse of its fundamental purpose. The purpose of the statute of limitations to prevent the litigation of stale claims is fully recognized and approved. But it was never intended to sanction active exploitation, by the beneficiary of the statutory bar, of opportunities only open to him if he assumes a position diametrically opposed to that taken prior to the running of the statute. . . . Legislation has long been needed to supplement the equitable principles applied by the courts and to check the growing volume of litigation by taking the profit out of inconsistency, whether exhibited by taxpayers or revenue officials *and whether fortuitous or the result of design.*

The legislation here proposed is based upon the following principles:

(1) To preserve unimpaired the essential function of the statute of limitations, corrective adjustments should (a) never modify the application of the statute except when the party or parties in whose favor it applies shall have justified such modification by active inconsistency, and (b) under no circumstances affect the tax save with respect to the influence of the particular items involved in the adjustment.

(2) Subject to the foregoing principles, disputes as to the year in which income or deductions belong, or as to the person who should have the tax burden of income or the tax benefit of deductions,

should never result in a double tax or a double reduction of tax, or an inequitable avoidance of tax.

. . . .

(4) Corrective adjustments should produce the effect of attributing income or deductions to the right year and the right taxpayer, and of establishing the proper basis.

S.Rep.No.1567, 75th Cong., 3d Sess. 49–50 (1938) (emphasis added).

Case law also supports the Commissioner's position that the mitigation provisions can apply regardless of who erroneously excluded the taxable item and who took inconsistent positions. In *Yagoda v. Commissioner,* 39 T.C. 170 (1962), *aff'd,* 331 F.2d 485 (2d Cir.), *cert. denied,* 379 U.S. 842, 85 S.Ct. 81, 13 L.Ed.2d 48 (1964), the Tax Court, focusing on section 1312(3)(A), said:

It is true, as petitioners contend, that the exclusion . . . was the result of the Commissioner's erroneous overassessments after the [petitioners] had correctly reported such income and paid taxes on it. Nevertheless, the net effect was a "double exclusion" of such . . . income, as described in section 1312(3)(A), and unless the mitigation provisions do apply herein, such income will now escape taxation. Insofar as the provisions of section 1312(3)(A) are concerned, it is immaterial that the Commissioner is partly to blame for the error to be corrected. All that is required under these provisions is that the determination result in a double exclusion of items of gross income from the income of the taxpayer with respect to whom the determination is made and from the income of related taxpayers.

*Id.* at 179.

In *Albert W. Priest Trust v. Commissioner,* 6 T.C. 221 (1946), the Tax Court considered and rejected the argument made by the taxpayers therein that the mitigation provisions should not apply to their disadvantage unless *they* had maintained inconsistent positions.

---

**3.** The mitigation provisions were first enacted as section 820 of the Revenue Act of 1938 and were codified as section 3801 of the Internal Revenue Code of 1939; they became sections 1311–1314 with the enactment of the Internal Revenue Code of 1954.

The sole requirement of the statute is that the position so adopted be inconsistent with the prior erroneous allowance of the deduction. It does not seem important to us who proposed the allowance of the deduction, or upon what theory. The important fact is that it was allowed, that a tax was paid pursuant to the allowance of the deduction, and that the action was erroneous.

*Id.* at 226.[4]

The case *sub judice* illustrates the inequities which would result if Taxpayers' arguments were adopted. Concededly, Taxpayers owed some tax on the stock redemption in either 1965 or 1966. They initially included this item in their 1966 tax return. The Commissioner then ruled the proper tax year was 1965; Taxpayers paid a deficiency judgment for 1965 and received a refund for 1966. After years of administrative and judicial litigation, the correct taxable year was finally determined to be 1966 and the deficiency paid for 1965 was refunded. In the meantime, the statute of limitations ran on April 15, 1970, and absent application of the mitigation provisions, Taxpayers would pay no tax on their profits from the stock redemption. Applying the Taxpayers' argument to a hypothetical case, a taxpayer could be the victim of a parallel inequity. If, for example, a future taxpayer belatedly claimed that a refund should be allowed by virtue of sections 1311(b)(1)(A) and 1312(1) or (4), he would be barred under Taxpayers' theory unless it was the Commissioner who had erroneously included income, disallowed deductions or maintained an inconsistent position rather than the taxpayer.

## II.

■ Taxpayers contend that even if the mitigation provisions apply, they are entitled to prevail on the ground that the redemption qualifies for capital gains treatment under section 302(b)(2).

Section 302 of the Internal Revenue Code provides the rules which determine the tax treatment of a redemption of stock. Subsection (a) provides that if any of the paragraphs of subsection (b) apply, the redemption is treated as a distribution in exchange for the stock, thereby entitling the redeeming shareholder to capital gains treatment. If the redemption fails to qualify under one of the categories in section 302(b), then it is treated as a distribution of property pursuant to section 301, i. e., as a dividend taxable as ordinary income. Section 302(b)(3) requires that a redemption be treated as an exchange "if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder." Taxpayer owned 33⅓ percent of E & T's stock in his name. However, section 318(a)(1)(A) provides that for the purposes of section 302, ownership of stock possessed by parents in a closely-held corporation shall be attributed to a child as if the child owned it. Therefore, Taxpayer constructively owned 100 percent of the stock and was entitled to capital gains treatment only if he met the waiver requirements set out in section 302(c)(2)(A). This section provides:

In the case of a distribution described in subsection (b)(3), section 318(a)(1) shall not apply if—

(i) immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor,

(ii) the distributee does not acquire any such interest (other than stock acquired by bequest or inheritance) within 10 years from the date of such distribution, and

(iii) the distributee, at such time and in such manner as the Secretary by regulations prescribes, files an agreement to notify the Secretary of any acquisition described in clause (ii) and to retain

4. Taxpayers rely heavily on *Kappel v. Commissioner*, 615 F.2d 91 (3d Cir. 1980), for the proposition that they must have maintained an active inconsistency which misled the Commissioner in order for the mitigation provisions to apply. *Kappel* is distinguishable, however, since it involved an attempt by the Commissioner to collect a tax for a year on which the statute of limitations had run before a statutory notice was first issued.

such records as may be necessary for the application of this paragraph.

The Tax Court upheld the Commissioner's determination that the Taxpayer retained stock interest after the attempted redemption because he did not comply with subsection (ii) above in that through the maintenance contract between Chertkof Co. and E & T, Taxpayer maintained a financial and control interest in E & T. It is the correctness of this holding that is in issue. If the holding is correct, the tax on E & T's redemption payment to the Taxpayer is ordinary dividend income tax rather than capital gains tax.

It is true that Chertkof Co. is a bona fide corporation. Its essential purpose, however, is engineering; it had never before managed property or engaged in the kind of commercial activity required by the maintenance contract. Taxpayer, on the other hand, was experienced in commercial property management. It is obvious from the sequence of events that it was his personal expertise that was acquired by the maintenance contract. The maintenance contract in effect gave complete control over E & T to Taxpayer (who had absolute control of Chertkof Co.), and with it power to use E & T in many ways which could inure to him financially.

Normally, unless a corporation is a sham, courts refuse to "pierce the corporate veil" to attribute its activities to its individual stockholders. *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348 (1934). Courts, however, are not restricted to a fairyland view of business and may disregard the separate entity where the transaction lacks a business purpose and is a mere formality. *Juniper Investment Co. v. United States*, 338 F.2d 356, 168 Ct.Cl. 160 (1964). *See DeWitt Truck Brokers, Inc. v. W. Ray Fleming Fruit Co.*, 540 F.2d 681 (4th Cir. 1976). Additionally, a corporation and its stockholders may be considered one entity for one purpose and separate entities for another. *United States v. Goldberg*, 206 F.Supp. 394 (E.D.

Pa.), *aff'd*, 330 F.2d 30 (3rd Cir.), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964).

It would take a simplistic view of the intrafamily business dealings reflected by the record to hold other than the Tax Court held—that the maintenance contract was in reality a contract between E & T and Taxpayer. It follows that the family attribution rules of section 318 were not waived because Taxpayer reacquired interests forbidden by 302(c)(2)(A)(ii). Not having all his stock redeemed, the payments received were not capital gains but ordinary dividend income.

*AFFIRMED.*