WILLIAM M. LYNCH AND MIMA W. LYNCH, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9509–79.    Filed October 22, 1984.

*Donald R. Share* and *Richard L. Greene,* for the petitioners.
*Charlotte Mitchell,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined deficiencies in the petitioners' Federal income tax of $15,465.80 for 1974 and $389,852.27 for 1975. After concessions, the sole issue for decision is whether the redemption of all of the petitioner's stock in W.M. Lynch Co. is taxable as dividend distributions under section 301 of the Internal Revenue Code of 1954[1] or as long-term capital gains under section 302(a). The answer turns on whether the petitioner retained a prohibited interest in such corporation within the meaning of section 302(c)(2)(A)(i) and whether the principal purpose of a transfer of stock to his son before the redemption was for tax avoidance within the meaning of section 302(c)(2)(B).

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, William M. and Mima W. Lynch, husband and wife, were residents of Dixon, CA, at the time they filed their petition in this case. They filed joint Federal income tax

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

returns for 1974 and 1975 with the Internal Revenue Service Center, Fresno, CA. Mr. Lynch will sometimes be referred to as the petitioner.

The petitioner has a degree in economics with a minor in business. In 1954, he formed a sole proprietorship to engage in the installation of concrete pipe. A few years later, he also became the exclusive licensee in six northern California counties for a patented cast-in-place concrete pipe machine. Over the years, the petitioner has both leased and purchased such machines.

On April 1, 1960, the petitioner formed a California corporation, the W.M. Lynch Co. (the corporation). The corporation issued to the petitioner 2,350 shares of its $10 par value common stock, all of its issued and outstanding capital stock. The petitioner owned some cast-in-place concrete pipe machines and held leases on other such machines. He decided to retain individually the ownership of such machines or the leases thereon, but he leased or subleased such machines to the corporation, which, in turn, subleased them to independent contractors. At approximately the time the corporation was formed, the petitioner decided to get out of the construction business and to restrict his business activities to the leasing of such machines. Within approximately 1 year following the formation of the corporation, the corporation ended its involvement in the construction business and restricted its activities to the leasing business.

Gilbert G. Lynch (Gilbert) is the petitioner's son. After receiving an M.B.A. in finance and accounting, he was employed in the mortgage banking business from 1967 until 1969. In 1969, he started working for the corporation as a salesman. In the same year, he was elected a director of the corporation, and in 1972, he was elected treasurer of the corporation.

On December 17, 1975, the petitioner gave Gilbert a check for $16,000. On the same date, the petitioner sold 50 shares of the capital stock of the corporation to Gilbert for $17,170, reflecting a purchase price of $343.40 per share. Gilbert paid for the 50 shares of stock with the $16,000 check given to him by the petitioner and $1,170 of his own money. Also on December 17, 1975, the petitioner and his wife resigned as directors and officers of the corporation.

On December 31, 1975, the corporation repurchased from the petitioner all 2,300 shares of its capital stock then owned by him for $789,820, reflecting a purchase price of $343.40 per share. The shares were capital assets in the hands of the petitioner on the date of the repurchase. In exchange for his stock, the petitioner received property with a fair market value of $17,900 and the corporation's 6-percent installment promissory note in the principal face amount of $771,920 (the note). The fair market value of the note when issued was $435,000. Gilbert guaranteed the note, and he pledged his 50 shares of the corporation's stock, all of the outstanding stock, as security for the guarantee. Gilbert subsequently acquired no additional shares of the corporation's stock. The pledge agreement provided that full control of the corporation would revert to the petitioner (including the right to vote the 50 shares of stock, to exercise any stock rights, and to sell the shares) in the event of a default by the corporation in its payments under the note.

As of March 31, 1975, the stated capital of the corporation was $23,500. On November 7, 1975, the petitioner contributed certain machinery and equipment, including cast-in-place concrete pipe machines, to the capital of the corporation. A value of $500,000 was assigned to the machinery and equipment contributed. The $500,000 paid-in surplus attributable to the petitioner's contribution was transferred to the corporation's stated capital account, resulting in a stated capital account totaling $523,500. On December 17, 1975, the stated capital account of the corporation was reduced from that amount to $500, creating a reduction surplus of $523,000. The reduction surplus was then withdrawn and distributed for the purpose of purchasing the petitioner's stock. The reduction surplus, plus the earned surplus of the corporation as of December 1975, $266,820, together total $789,820, which is the purchase price arrived at for the redemption of the petitioner's stock.

For approximately 2 years prior to the redemption, Gilbert had become increasingly concerned that the corporation would run out of areas in which to diversify if it remained solely in the machinery rental business. He believed that in order for the company to survive, it had to get into the construction business. The petitioner recognized that some change was

probably necessary, but he did not want to modify the business of the corporation as he did not like the construction business because of the problems and risks inherent in it. Prior to the redemption, Gilbert had begun to assume more and more managerial responsibility for the affairs of the corporation. After the redemption, Gilbert assumed control over the corporation and did begin to expand the business of the corporation into the construction business. However, at least until 1978, the principal business of the corporation continued to be the leasing of cast-in-place concrete pipe machines.

At the time of the redemption of the petitioner's stock, he was approximately 61 years old. Although Gilbert had a general knowledge of the technical aspects of the corporation's business, and although the corporation had employees with sufficient technical expertise, Gilbert believed that it would be beneficial to the corporation to have available, on a consulting basis, the technical expertise of the petitioner. On the same day that his stock was redeemed, the petitioner entered into a written consulting agreement with the corporation. The consulting agreement provided for payment to the petitioner of $500 per month for a term of 5 years. The agreement also provided that the petitioner would be reimbursed by the corporation for the actual costs of his business expenses for travel, entertainment, and automobile. Pursuant to the agreement, the petitioner agreed to render such consulting services of an advisory nature as the corporation might reasonably request. The agreement provided that the petitioner could terminate the agreement at any time and that the agreement would terminate automatically upon the petitioner's death or incapacity. The agreement also provided that, while it was in effect, the petitioner would not directly or indirectly engage in any business similar to that carried on by the corporation and that he would not become directly or indirectly financially interested in any business activity in competition with the business of the corporation within the counties of the State of California in which the business of the corporation was conducted.

The expertise which the petitioner could furnish to the corporation related to his intimate knowledge of the technical aspects of the cast-in-place concrete pipe machines. There are only two other concerns in the Western United States which

own machines of the type which the corporation leases. Thus, the market for the petitioner's technical expertise was extremely narrow.

Since the redemption, the petitioner has been consulted on an irregular basis by telephone and in person by supervisory personnel of the corporation on various technical matters primarily relating to the equipment used in the pipe fabrication process. In 1976, the petitioner assisted in the layout of the yard and the location of buildings and equipment at the corporation's plant in San Marcos, CA. In 1976 and 1977, he advised the corporation on the renovation, repair, and standardization of 13 used pipe machines which the corporation had acquired. Immediately after the redemption, the petitioner went to the corporation's office daily, but as time passed, he went to the office less often. Approximately a year after the redemption, he went to the office only once or twice a week, and sometimes he had no contact with the corporation for weeks at a time.

After the redemption, the petitioner shared his former office with Gilbert. When the corporation moved to a new office building in 1979, a private office was provided for the petitioner. After the redemption, the corporation provided the petitioner with the use of certain vehicles, including a pickup truck, which the corporation leased or purchased in 1977 for his use and which he used for approximately 2 years. If someone at the corporation needed the pickup truck, the petitioner made it available to him.

Beginning in February 1977, the petitioner and the corporation mutually agreed to reduce the monthly payments to the petitioner to $250. Effective December 31, 1979, the parties terminated the consulting agreement, 1 year prior to the expiration of the 5-year term originally provided for in the agreement. The corporation never withheld any payroll taxes from the payments it made to the petitioner under the agreement.

Prior to the redemption of his stock, the petitioner was one of the named beneficiaries under the corporation's group medical insurance policy. After the redemption, the petitioner continued to be covered by such policy until his coverage was canceled by the corporation on May 1, 1980. From January 1, 1976, through April 30, 1980, the corporation paid a total of

$4,913.42 in premiums attributable to coverage of the petitioner. After his coverage ended, the petitioner paid the corporation $425.88 in order to reimburse it for the cost of his insurance coverage during 1980. Thus, the net cost to the corporation for the petitioner's coverage after the redemption was $4,487.54.

In addition, on December 17, 1975, the corporation adopted a medical expense reimbursement plan which covered the corporation's key managerial employees and their dependents. After his resignation as an officer and director, the petitioner and his wife, as his dependent, were covered by the plan. The medical reimbursement plan provided that no covered person could receive in excess of $1,000 of medical expense reimbursements during any one year. Under such plan, the corporation reimbursed the petitioner a total of $96.05 for medical expenses incurred during the time the petitioners were covered by the plan. The last such reimbursement was made in April 1976.

The corporation has timely paid all monthly installments on the note. When the corporation issued the note to the petitioner, its obligation thereunder was not subordinate to its obligation to any other creditor. On May 12, 1976, the corporation obtained a $350,000 loan from the First National Bank of Dixon. As a condition to obtaining the loan, the corporation was required by the bank to enter into a subordination agreement with the petitioner whereby the petitioner agreed to subordinate the corporation's indebtedness to him to its indebtedness to the bank under the loan. The indebtedness of the corporation to the petitioner was subordinated only to the bank loan and not to other debts of the corporation. In May 1976, the corporation owned assets in the form of equipment with an appraised value of $985,000. In connection with the loan it made to the corporation, the bank took a security interest in such equipment.

The corporation obtained the bank loan in order to enable it to finance the purchase of 13 used cast-in-place concrete pipe machines. The purchase of such machines served the dual purpose of having the machines available for use by the corporation in Southern California while, at the same time, preventing the machines from being used by the corporation's competitors.

During 1974 and 1975, the petitioner was employed by the corporation as its general manager. For 1974, he was paid a salary totaling $29,121 and for 1975, $63,000. During the period that the petitioner was the sole shareholder of the corporation, it never paid a dividend. At the time of the redemption, the corporation had accumulated earnings and profits of $315,863. Since the redemption, the corporation has continued to be profitable.

On their joint income tax return for 1975, the petitioners reported the amount received from the corporation for the petitioner's stock as a capital gain, and they elected install-ment reporting for payments received under the note. The Commissioner determined that, to the extent that the corpora-tion had accumulated earnings and profits as of December 1975, the amount received by the petitioners for the petition-er's stock from the corporation was properly reportable as a dividend and taxable as ordinary income in the year received.

On November 21, 1977, the petitioners filed an amended Federal income tax return for 1975. They attached to such return an agreement pursuant to section 302(c)(2)(A)(iii), wherein they agreed to notify the Commissioner, within 10 years from the date of the redemption, of any acquisition described in section 302(c)(2)(A)(ii). The Commissioner does not contend that the agreement should be deemed void for untimeliness.

OPINION

The sole issue for decision is whether the redemption of all of the petitioner's stock in the corporation is taxable as a dividend distribution under section 301 or as long-term capital gain under section 302(a). Section 302(a) provides that a distribution of property to a shareholder by a corporation in redemption of stock is treated as a sale or exchange of such stock if the redemption falls within one of four categories described in section 302(b). If the redemption fails to so qualify, it is treated as a dividend distribution to the extent of the corporation's earnings and profits. See secs. 301, 302(a).

Section 302(b)(3) provides that a shareholder is entitled to sale or exchange treatment if all of his stock in the corporation is redeemed. For purposes of determining whether there has been a complete redemption within the meaning of section

302(b)(3), the constructive stock ownership rules of section 318(a) are applicable unless the requirements set out in section 302(c)(2) are satisfied. Sec. 302(c)(1). In the present case, if the attribution rules are applicable, the stock owned by Gilbert after the redemption is attributed to the petitioner, and the redemption by him fails to qualify as a complete redemption within the meaning of section 302(b)(3).

Section 302(c)(2)(A) provides in relevant part as follows:

(A) In the case of a distribution described in subsection (b)(3), section 318(a)(1) shall not apply if—

(i) immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor,

(ii) the distributee does not acquire any such interest (other than stock acquired by bequest or inheritance) within 10 years from the date of such distribution, and

(iii) the distributee, at such time and in such manner as the Secretary by regulations prescribes, files an agreement to notify the Secretary of any acquisition described in clause (ii) and to retain such records as may be necessary for the application of this paragraph.

The Commissioner takes the position that the petitioner retained a prohibited interest in the corporation within the meaning of section 302(c)(2)(A)(i). First, he maintains that the petitioner continued to be a paid employee of the corporation after the redemption, that the petitioner continued to have access to substantial corporate benefits, and that the petitioner continued to participate in the corporation's day-to-day business affairs in a position from which he could exercise influence.

Section 302(c)(2) was enacted as part of the Internal Revenue Code of 1954 to provide that when there is a bona fide severance of a shareholder's interest in a corporation, he will receive capital gains treatment. H. Rept. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 36 (1954); S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 45 (1954). We have previously stated that it is reasonable to infer from the legislative history that in enacting section 302(c)(2)(A), Congress was primarily concerned with a situation where a redeeming shareholder retained a financial stake in the corporation or continued to control the corporation and benefit by its operations after making only a nominal transfer of his stock. *Seda v. Commissioner*, 82 T.C. 484, 488 (1984);

*Estate of Lennard v. Commissioner,* 61 T.C. 554, 561 (1974); *Lewis v. Commissioner,* 47 T.C. 129, 136 (1966) (Simpson, J., concurring). Immediately after the enactment of the 1954 Code, it was recognized that section 302(c)(2)(A)(i) did not prohibit office holding per se, but was concerned with a retained financial stake in the corporation, such as a profit-sharing plan, or in the creation of an ostensible sale that really changed nothing so far as corporate management was concerned. *Lewis v. Commissioner, supra* at 137–138 (Simpson, J., concurring), citing Bittker, "Stock Redemptions and Partial Liquidations under the Internal Revenue Code of 1954," 9 Stan. L. Rev. 13, 33 n. 72 (1956). See also Bittker, "The Taxation of Stock Redemptions and Partial Liquidations," 44 Cornell L. Q. 299, 316 (1959). Thus, in determining whether a prohibited interest has been retained under section 302(c)(2)(A)(i), we must look to whether the former stockholder has either retained a financial stake in the corporation or continued to control the corporation and benefit by its operations. *Seda v. Commissioner, supra* at 488; *Chertkof v. Commissioner,* 72 T.C. 1113, 1124-1126 (1979), affd. 649 F.2d 264 (4th Cir. 1981); *Estate of Lennard v. Commissioner, supra* at 560–562; B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.23, at 9–26 to 9–27 (4th ed. 1979). In particular, where the interest retained is not that of an officer, director, or employee, we must examine the facts and circumstances to determine whether a prohibited interest has been retained under section 302(c)(2)(A)(i). *Seda v. Commissioner,* 82 T.C. at 491 (Whitaker, J., concurring)[2]; *Chertkof v. Commissioner,* 72 T.C. at 1124–1126; *Estate of Lennard v. Commissioner, supra.*

The Commissioner's argument that the petitioner retained a financial stake in the corporation is based largely on his contention that the petitioner was an employee of the corporation after the redemption. The petitioners, on the other hand, argue that pursuant to the consulting agreement, the petitioner's relationship with the corporation was that of an indepen-

---

[2]In *Seda,* Judge Whitaker and seven other Judges concurred and expressed the view that if the distributee continues as a true employee of the corporation, the Court should conclude that he has retained a prohibited interest without any further consideration of the surrounding facts and circumstances, but those Judges also recognized that if the distributee is not an employee, an examination of the surrounding facts and circumstances is required.

dent contractor. Where previously we have been required to determine whether an individual was an independent contractor or an employee for purposes of section 302(c)(2)(A), we have looked to whether the individual was subject to the control of the corporation. *Estate of Lennard v. Commissioner*, 61 T.C. at 561; see sec. 31.3401(c)–1(b), Employment Tax Regs.

In the present case, the petitioner was not subject to the control of the corporation. Immediately after the redemption, he chose to go to the office daily, but as time passed, he appeared less often. Approximately a year after the redemption, he went to the office only about once or twice a week, and sometimes he had no contact with the corporation for weeks at a time. Moreover, the evidence in the record establishes that he, himself, determined when he would be at the corporation's offices and what he would do there. Indeed, on a number of occasions, the petitioner, when requested by the corporation to perform consulting services, informed the corporation that he was not available. The petitioner did perform consulting services with respect to the layout of the corporation's yard in San Marcos, and he did advise the corporation with respect to its acquisition and standardization of the 13 used pipe machines. However, such activities are consistent with the petitioner's status as an independent contractor. The corporation never withheld any payroll taxes from the payments it made to the petitioner under the consulting agreement. After the redemption, the petitioner did continue to be covered by the corporation's group health insurance policy and its medical reimbursement plan, but although that coverage tends to indicate that he was treated as an employee for some purposes, we have concluded that the weight of the evidence establishes that he was not an employee of the corporation after the redemption.

In light of such conclusion, it is clear that we must examine all the surrounding facts and circumstances to determine whether the petitioner retained a financial stake in the corporation or continued to control the corporation after the redemption of his stock. The record shows that the petitioner did not have a financial stake in the corporation after the redemption. The payments which the petitioner received pursuant to the consulting agreement were in no sense contingent on the profitability or the future operations of the

corporation. Indeed, while the corporation continued to be profitable after the redemption, the payments to the petitioner under the consulting agreement were reduced by one-half approximately 1 year after the redemption by the mutual assent of the parties, and 1 year prior to the end of the consulting agreement, such payments, also by the mutual assent of the parties, were terminated altogether. Nor were the benefits received by the petitioner sufficient to give him a financial stake in the corporation. Compare *Lewis v. Commissioner*, 47 T.C. at 135.[3] The petitioner was covered under the corporation's group health insurance policy, and the corporation paid $4,487.54 for such coverage after the redemption. Both petitioners were covered under the corporation's medical reimbursement plan, but they received only a total of $96.05 under such plan after the redemption. Lastly, the corporation provided the petitioner with the use of a pickup truck. In summary, the payments under the consulting agreement, together with the other benefits received by the petitioner, were in no way contingent on the future profitability of the corporation, and in the aggregate, they did not constitute a significant or substantial interest in the continued success of the business.

The evidence also shows that after the redemption the petitioner made no effort to continue to control the corporation. The petitioner's son, Gilbert, had for sometime prior to the redemption begun to assume more and more managerial responsibility for the affairs of the corporation. It was Gilbert who believed that the corporation needed to diversify and to get into the construction business in order to continue to be profitable. Based on the record before us, we conclude that Gilbert, as of the redemption, both nominally and in fact, assumed complete control over the corporation. After the redemption, the petitioner may have given Gilbert some advice with respect to the affairs of the corporation, but advice alone is not prohibited. *Estate of Lennard v. Commissioner*, 61 T.C. at 561. Moreover, the employees of the corporation who continued to work for the corporation after the redemption, had sufficient technical expertise to carry on the operations of the corporation.

---

[3] See also *Lisle v. Commissioner*, T.C. Memo. 1976–140.

In the present case, the Commissioner has not argued that after the redemption of his stock, the petitioner continued to control the corporation. Rather, the Commissioner's argument is that after the redemption, the petitioner remained in a position from which he could exercise influence over the affairs of the corporation. Cf. *Chertkof v. Commissioner*, 72 T.C. at 1124–1126. We do not believe that what the petitioner might have done is controlling. The evidence in the record establishes that in fact Gilbert, and not the petitioner, controlled the corporation after the redemption. For such reasons, we conclude that the petitioner did not retain control of the corporation after the redemption.[4]

Second, the Commissioner argues that the petitioner retained a prohibited interest within the meaning of section 302(c)(2)(A)(i) because the note received by the petitioner upon the redemption of his stock was more in the nature of a retained equity interest than an interest as a creditor. He bases his contention on the fact that subsequent to the redemption, the petitioner agreed to subordinate the note to enable the corporation to take advantage of an opportunity to expand and to gain a competitive advantage. The petitioners contend that under section 1.302–4(d) of the Income Tax Regulations, the subordination agreement should not cause the petitioner's claim against the corporation to be treated as an equity interest.

Section 1.302–4(d), Income Tax Regs., provides:

(d) For the purpose of section 302(c)(2)(A)(i), a person will be considered to be a creditor only if the rights of such person with respect to the corporation are not greater or broader in scope than necessary for the enforcement of his claim. Such claim must not in any sense be proprietary and must not be subordinate to the claims of general creditors. An obligation in the form of a debt may thus constitute a proprietary interest. For example, if under the terms of the instrument the corporation may discharge the principal amount

---

[4]In part, the Commissioner relies on Rev. Rul. 70–104, 1970–1 C.B. 66, wherein it was determined that a taxpayer's interest in a corporation is not terminated within the meaning of sec. 302(b)(3) if his stock is redeemed and he enters into a long-term contract to perform consultant and advisory services for the corporation. Such revenue ruling held that the performance by the taxpayer of services pursuant to the consulting agreement is an "interest in the corporation" within the meaning of sec. 302(c)(2)(A)(i). In *Estate of Lennard v. Commissioner*, 61 T.C. 554 (1974), we distinguished such revenue ruling and held that in the case of an independent contractor, we will examine all the surrounding facts and circumstances to determine whether the shareholder retained a financial stake in the corporation or control over it. In the present case, we adopt a similar position and reach a similar conclusion.

of its obligation to a person by payments, the amount or certainty of which are dependent upon the earnings of the corporation, such a person is not a creditor of the corporation. Furthermore, if under the terms of the instrument the rate of purported interest is dependent upon earnings, the holder of such instrument may not, in some cases, be a creditor.

Initially, we observe that the examples contained in such regulations which evince that the distributee is not merely a creditor are not applicable in the present case. Here, the corporation's obligation under the note as to the amount or certainty of the required payments was not dependent upon the earnings of the corporation; nor was the interest rate to be paid under the note dependent upon earnings.

We have previously held that subordination, if it exists, is only one of several factors to be taken into account in determining whether a particular interest is other than that of a creditor. *Dunn v. Commissioner*, 70 T.C. 715, 727 (1978), affd. 615 F.2d 578 (2d Cir. 1980); *Estate of Lennard v. Commissioner*, 61 T.C. at 563. Thus, subordination alone is not sufficient for us to find that the petitioner retained an interest other than as a creditor. The applicable regulations state that the shareholder's "claim must not in any sense be proprietary *and* must not be subordinate to the claims of general creditors." Sec. 1.302–4(d), Income Tax Regs.; emphasis added. In the present case, the petitioner's interest in the corporation after the redemption cannot fairly be characterized as "proprietary." We have already determined that he did not retain a financial stake in the corporation, nor did he retain control of the corporation after the redemption. Moreover, the payments to the petitioner under the note were not contingent on the future profitability or operations of the corporation. Finally, the corporation's obligation to the petitioner under the note was not subordinated to the general creditors of the corporation; rather, such obligation was subordinated to a single creditor. Also, the bank acquired a security interest in the corporation's equipment, which had an appraised value of $985,000, so that there may have been little risk to the petitioner in agreeing to the subordination of his note. Under such circumstances, we believe that the subordination agreement, when considered in conjunction with the other facts in the present case, did not cause the petitioner's claim as a creditor to become an equity interest.

Third, the Commissioner argues that the pledge agreement entered into between the petitioner and Gilbert demonstrates that the note was more in the nature of a retained equity interest than an interest as a creditor. In support of his contention, the Commissioner relies upon section 1.302–4(e), Income Tax Regs., which provides:

(e) In the case of a distributee to whom section 302(b)(3) is applicable, who is a creditor after such transaction, the acquisition of the assets of the corporation in the enforcement of the rights of such creditor shall not be considered an acquisition of an interest in the corporation for purposes of section 302(c)(2) unless stock of the corporation, its parent corporation, or, in the case of a redemption of stock of a parent corporation, of a subsidiary of such corporation is acquired.

In our view, such regulations have no applicability in the present case. By its own terms, section 1.302–4(e), Income Tax Regs., pertains to the enforcement of a creditor's rights. Such regulations provide that if, in the enforcement of his claim as a creditor, a stockholder acquires the assets of the corporation, the acquisition of such assets will not be considered an acquisition of an interest in the corporation for purposes of the applicability of the attribution rules under section 302(c)(2), but the regulations imply that if the stockholder acquires stock, the acquisition of such stock will constitute a prohibited interest. T. Ness & E. Vogel, Taxation of the Closely Held Corporation, sec. 10.4(b), at 10–39 n. 20 (3d ed. 1983). However, the petitioner did not in fact acquire either the assets or the stock of the corporation. He had merely a right to acquire such stock in the event of a default by the corporation, and the regulations do not deal with that security interest. The holding of such a security interest is common in sales agreements, and in our judgment, it is not inconsistent with the interest of a creditor. See Lewis v. Commissioner, 47 T.C. at 131, 133. Having not been convinced by any of the Commissioner's arguments, we conclude and hold that the petitioner did not retain a prohibited interest within the meaning of section 302(c)(2)(A).

The Commissioner also takes the position that the attribution rules are applicable by reason of the provisions of section 302(c)(2)(B). He contends that the transfer of stock to Gilbert had as one of its principal purposes the avoidance of Federal income tax within the meaning of section 302(c)(2)(B)(ii).

Under such provision, the attribution rules of section 318(a) are applicable in determining whether there has been a complete redemption of a shareholder's interest in a corporation if:

(ii) any person owns (at the time of the distribution) stock the ownership of which is attributable to the distributee under section 318(a) and such person acquired any stock in the corporation, directly or indirectly, from the distributee within the 10-year period ending on the date of the distribution, unless such stock so acquired from the distributee is redeemed in the same transaction.

However, section 302(c)(2)(B) also provides that such restriction "shall not apply if the * * * disposition * * * by the distributee did not have as one of its principal purposes the avoidance of Federal income tax." Thus, under the statute, the transaction to be examined for tax avoidance is the transfer of stock from the petitioner to Gilbert. B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.23, at 9–28 to 9–29 (4th ed. 1979); T. Ness & E. Vogel, Taxation of the Closely Held Corporation, sec. 10.4(b), at 10–40, S.10–12 to S.10–13 (3d ed. 1983, and 1984 Cumm. Supp.).

The Commissioner's argument is, by his own admission, circumstantial. He does not contend that the transfer of the 50 shares of stock to Gilbert alone demonstrates a tax-avoidance motive. Rather, he argues that the cumulative weight of the evidence demonstrates that avoidance of taxes was one of the principal purposes for each of the steps undertaken by the parties in the redemption transaction, including the step which involved the transfer of 50 shares of stock to Gilbert. The Commissioner's contention is that the petitioner, through a series of relatively sophisticated transactions, secured a distribution of the corporation's retained earnings and profits and sought to avoid paying a tax on such retained earnings and profits at ordinary income rates. The petitioners, on the other hand, argue that the transfer of the 50 shares of stock to Gilbert was intended in conjunction with the redemption to transfer ownership of the corporation from the petitioner to Gilbert. They recognize that the transfer to Gilbert may be

viewed as a gift to him,[5] but they claim that there was no tax-avoidance purpose in such transfer.

Based on the record before us, we are convinced that the transfer by the petitioner to Gilbert prior to the redemption did not have as one of its principal purposes the avoidance of Federal income tax. We find the Commissioner's argument on this question to be convoluted as well as circumstantial. The evidence establishes that the petitioner, in transferring the 50 shares of stock to Gilbert and thereafter redeeming his remaining shares, sought to transfer ownership of the corporation to Gilbert. We do not find a tax-avoidance purpose in the transfer. The purpose of the transfer to Gilbert, and the sole purpose for that transfer, was to effect the eventual transfer of the ownership of the corporation to Gilbert. Moreover, the fact that the petitioner's redemption of his stock will be treated as a sale or exchange of such stock and that he will thereby obtain long-term capital gain treatment of the proceeds of the redemption does not establish a tax-avoidance motive. Section 302 provides for such treatment if the requirements of section 302(b) are met.

The Commissioner's final argument is that the price which the corporation paid for the petitioner's stock was unjustifiably inflated, reflecting the fact that the parties to the redemption were not dealing with each other at arm's length, and that thus there was no bona fide sale or exchange of the petitioner's stock which would justify capital gains treatment. The petitioners point out that the Commissioner is attempting, in his brief, to interject a new theory into the present case. They contend that the Commissioner bears the burden of proof with respect to such argument pursuant to Rule 142(a), Tax Court Rules of Practice and Procedure, and that the Commissioner's argument is not supported by the record.

It is well settled that the Commissioner may not raise a new theory for the first time on brief where the petitioner had no opportunity to address such theory at trial and where he is prejudiced by the lack of such opportunity. *Riss v. Commissioner*, 57 T.C. 469, 472–474 (1971) (Supplemental Opinion), affd. on this issue sub nom. *Commissioner v. Transport Mfg. & Equip. Co.*, 478 F.2d 731, 734–736 (8th Cir. 1973); *Theatre*

---

[5]The Commissioner has stated that he is not asserting any gift tax liability with respect to the transfer of stock from the petitioner to Gilbert.

*Concessions, Inc. v. Commissioner*, 29 T.C. 754, 760–761 (1958); *Tully v. Commissioner*, 28 T.C. 265, 269 (1957). The present case falls within such rule. The petitioners were not informed that the Commissioner intended to argue that the redemption of the petitioner's stock was not a bona fide sale or exchange because the price paid for such stock was inflated until such argument was advanced in the Commissioner's brief. Accordingly, at trial, the petitioners did not seek to introduce evidence concerning how the price paid by the corporation for the petitioner's stock was determined. Since the Commissioner's theory was presented for the first time in his brief, we will not consider such theory.

In conclusion, we hold that the redemption of all of the petitioner's stock in the corporation is taxable as long-term capital gain under section 302(a).

*Decision will be entered under Rule 155.*