William M. LYNCH and Mima W. Lynch, Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

No. 85–7456.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 17, 1986.

Decided Oct. 8, 1986.

Donald R. Share, Greene, Radovsky, Maloney, & Share, San Francisco, Cal., for petitioners-appellees.

Michael L. Paup, Bruce Ellisen, Jonathan S. Cohen, Attys., Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellant.

Before FARRIS, HALL and KOZINSKI, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

The Commissioner of the Internal Revenue Service (Commissioner) petitions for review of a Tax Court decision holding that a corporate redemption of a taxpayer's stock was a sale or exchange subject to capital gains treatment. The Commissioner argues that the taxpayer held a prohibited interest in the corporation after the redemption and therefore the transaction should be characterized as a dividend distribution taxable as ordinary income. We agree with the Commissioner and reverse the Tax Court.

I

Taxpayers, William and Mima Lynch, formed the W.M. Lynch Co. on April 1, 1960. The corporation issued all of its outstanding stock to William Lynch (taxpayer). The taxpayer specialized in leasing cast-in-

place concrete pipe machines.[1] He owned the machines individually but leased them to the corporation which in turn subleased the equipment to independent contractors.

On December 17, 1975 the taxpayer sold 50 shares of the corporation's stock to his son, Gilbert Lynch (Gilbert), for $17,170. Gilbert paid for the stock with a $16,000 check given to him by the taxpayer and $1,170 from his own savings. The taxpayer and his wife also resigned as directors and officers of the corporation on the same day.

On December 31, 1975 the corporation redeemed all 2300 shares of the taxpayer's stock. In exchange for his stock, the taxpayer received $17,900 of property and a promissory note for $771,920. Gilbert, as the sole remaining shareholder, pledged his 50 shares as a guarantee for the note. In the event that the corporation defaulted on any of the note payments, the taxpayer would have the right to vote or sell Gilbert's 50 shares.

In the years immediately preceding the redemption, Gilbert had assumed greater managerial responsibility in the corporation. He wished, however, to retain the taxpayer's technical expertise with cast-in-place concrete pipe machines. On the date of the redemption, the taxpayer also entered into a consulting agreement with the corporation. The consulting agreement provided the taxpayer with payments of $500 per month for five years, plus reimbursement for business related travel, entertainment, and automobile expenses.[2] In February 1977, the corporation and the taxpayer mutually agreed to reduce the monthly payments to $250. The corpora-

tion never withheld payroll taxes from payments made to the taxpayer.

After the redemption, the taxpayer shared his former office with Gilbert. The taxpayer came to the office daily for approximately one year; thereafter his appearances dwindled to about once or twice per week. When the corporation moved to a new building in 1979, the taxpayer received a private office.

In addition to the consulting agreement, the taxpayer had other ties to the corporation. He remained covered by the corporation's group medical insurance policy until 1980. When his coverage ended, the taxpayer had received the benefit of $4,487.54 in premiums paid by the corporation. He was also covered by a medical reimbursement plan, created the day of the redemption, which provided a maximum annual payment of $1,000 per member. Payments to the taxpayer under the plan totaled $96.05.

## II

We must decide whether the redemption of the taxpayer's stock in this case is taxable as a dividend distribution under 26 U.S.C. § 301 or as long-term capital gain under 26 U.S.C. § 302(a).[3] Section 302(a) provides that a corporate distribution of property in redemption of a shareholder's stock is treated as a sale or exchange of such stock if the redemption falls within one of four categories described in section 302(b). If the redemption falls outside of these categories, then it is treated as a dividend distribution under section 301 to the extent of the corporation's earnings and profits.[4]

1. The cast-in-place process avoids the need to transport precast pipe to the job site. Instead, a trench is dug wide enough to accommodate the desired pipe diameter. A cast-in-place machine moves along the trench while fresh cement is poured from transport trucks. The machine casts the bottom third of the pipe first, and then forms are added to complete the remaining two-thirds.

2. The corporation leased or purchased a pickup truck for the taxpayer's use in 1977. If some-

one at the corporation needed the truck, the taxpayer would make it available to him.

3. All statutory references are to the Internal Revenue Code of 1954 (Title 26 U.S.C.) as amended and in effect for the years in issue, unless otherwise indicated.

4. On the date of the redemption, W.M. Lynch Co. had accumulated earnings and profits of $315,863, and had never paid a dividend.

Section 302(b)(3) provides that a shareholder is entitled to sale or exchange treatment if the corporation redeems all of the shareholder's stock. In order to determine whether there is a complete redemption for purposes of section 302(b)(3), the family attribution rules of section 318(a) must be applied unless the requirements of section 302(c)(2) are satisfied. Here, if the family attribution rules apply, the taxpayer will be deemed to own constructively the 50 shares held by Gilbert (100% of the corporation's stock) and the transaction would not qualify as a complete redemption within the meaning of section 302(b)(3).

Section 302(c)(2)(A) states in relevant part:

In the case of a distribution described in subsection (b)(3), [the family attribution rules in] section 318(a)(1) shall not apply if—

(i) immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor....

The Commissioner argues that in every case the performance of post-redemption services is a prohibited interest under section 302(c)(2)(A)(i), regardless of whether the taxpayer is an officer, director, employee, or independent contractor.

The Tax Court rejected the Commissioner's argument, finding that the services rendered by the taxpayer did not amount to a prohibited interest in the corporation. In reaching this conclusion, the Tax Court relied on a test derived from *Lewis v. Commissioner*, 47 T.C. 129, 136 (1966) (Simpson, J., concurring):

Immediately after the enactment of the 1954 Code, it was recognized that section 302(c)(2)(A)(i) did not prohibit office holding per se, but was concerned with a retained financial stake in the corporation, such as a profit-sharing plan, or in the creation of an ostensible sale that

really changed nothing so far as corporate management was concerned. Thus, in determining whether a prohibited interest has been retained under section 302(c)(2)(A)(i), we must look to whether the former stockholder has either retained a financial stake in the corporation or continued to control the corporation and benefit by its operations. In particular, where the interest retained is not that of an officer, director, or employee, we must examine the facts and circumstances to determine whether a prohibited interest has been retained under section 302(c)(2)(A)(i).

*Lynch v. Commissioner*, 83 T.C. 597, 605 (1984) (citations omitted).

After citing the "control or financial stake" standard, the Tax Court engaged in a two-step analysis. First, the court concluded that the taxpayer was an independent contractor rather than an employee because the corporation had no right under the consulting agreement to control his actions.[5] *Id.* at 606. Second, the court undertook a "facts and circumstances" analysis to determine whether the taxpayer had a financial stake in the corporation or managerial control after the redemption. Because the consulting agreement was not linked to the future profitability of the corporation, the court found that the taxpayer had no financial stake. *Id.* at 606–07. The court also found no evidence that the taxpayer exerted control over the corporation. *Id.* at 607. Thus, the Tax Court determined that the taxpayer held no interest prohibited by section 302(c)(2)(A)(i).

### III

We review the decisions of the Tax Court on the same basis as decisions in civil bench trials in district courts, *Mayors v. Commissioner*, 785 F.2d 757, 759 (9th Cir.1986), with no special deference paid to the Tax Court's conclusions of law. *Vukasovich, Inc. v. Commissioner*, 790 F.2d

---

**5.** Finding that the taxpayer was not an employee obviated the need to decide whether the parenthetical language in section 302(c)(2)(A)(i) prohibited employment relationships per se.

*See Seda v. Commissioner*, 82 T.C. 484, 488 (1984) (court stated that "section 302(c)(2)(A)(i) may not prohibit the retention of all employment relationships").

1409, 1413 (9th Cir.1986). The Tax Court's interpretation of what constitutes a prohibited interest under section 302(c)(2)(A)(i) is a question of law reviewed de novo. *Orvis v. Commissioner*, 788 F.2d 1406, 1407 (9th Cir.1986); *Ebben v. Commissioner*, 783 F.2d 906, 909 (9th Cir.1986).

■ We reject the Tax Court's interpretation of section 302(c)(2)(A)(i). An individualized determination of whether a taxpayer has retained a financial stake or continued to control the corporation after the redemption is inconsistent with Congress' desire to bring a measure of certainty to the tax consequences of a corporate redemption. We hold that a taxpayer who provides post-redemption services, either as an employee or an independent contractor, holds a prohibited interest in the corporation because he is not a creditor.

The legislative history of section 302 states that Congress intended to provide "definite standards in order to provide certainty in specific instances." S.Rep. No. 1622, 83d Cong.2d Sess. 233, *reprinted in* 1954 U.S.Code Cong. & Ad.News 4017, 4621, 4870. "In lieu of a factual inquiry in every case, [section 302] is intended to prescribe specific conditions from which the taxpayer may ascertain whether a given redemption" will qualify as a sale or be treated as a dividend distribution. H.R. Rep. No. 1337, 83d Cong.2d Sess. 35, *reprinted in* 1954 U.S.Code Cong. & Ad. News 4017, 4210. The facts and circumstances approach created by the Tax Court undermines the ability of taxpayers to execute a redemption and know the tax consequences with certainty.

The taxpayer's claim that the Senate rejected the mechanical operation of the House's version of section 302 is misleading. The Senate did reject the House bill because the "definitive conditions" were "unnecessarily restrictive." S.Rep. No. 1622, 83d Cong., 2d Sess. 44, *reprinted in* 1954 U.S.Code Cong. & Ad.News 4621, 4675. However, the Senate's response was to add paragraph (b)(1) to section 302, which reestablished the flexible, but notoriously vague, "not essentially equivalent to a dividend" test. This test provided that all payments from a corporation that were not essentially equivalent to a dividend should be taxed as capital gains. The confusion that stemmed from a case-by-case inquiry into "dividend equivalence" prompted the Congress to enact definite standards for the safe harbors in section 302(b)(2) and (b)(3). The Tax Court's refusal to recognize that section 302(c)(2)(A)(i) prohibits *all* noncreditor interests in the corporation creates the same uncertainty as the "dividend equivalence" test.

The problem with the Tax Court's approach is apparent when this case is compared with *Seda v. Commissioner*, 82 T.C. 484 (1984). In *Seda*, a former shareholder, at his son's insistence, continued working for the corporation for two years after the redemption. He received a salary of $1,000 per month. The Tax Court refused to hold that section 302(c)(2)(A)(i) prohibits the retention of employment relations per se, despite the unequivocal language in the statute.[6] *Id.* at 488. Instead, the court applied the facts and circumstances approach to determine whether the former shareholder retained a financial stake or continued to control the corporation. The Tax Court found that the monthly payments of $1,000 constituted a financial stake in the corporation. *Id.* This result is at odds with the holding in *Lynch* that payments of $500 per month do *not* constitute a financial stake in the corporation. *Compare Lynch*, 83 T.C. at 606–07 *with Seda*, 82 T.C. at 488. The court also found in *Seda* no evidence that the former shareholder had ceased to manage the corporation. 82 T.C. at 488. Again, this finding is contrary to the holding in *Lynch* that the taxpayer exercised no control over the corporation after the redemption, even though he worked daily for a year and shared his old office with his son. *Compare Lynch*, 83 T.C. at 607 *with*

**6.** Eight of the seventeen Tax Court judges who reviewed *Seda* concurred in the result but would have classified all officer, director, or employee relationships as prohibited interests under section 302(c)(2)(A)(i).

*Seda,* 82 T.C. 488. *Seda* and *Lynch* thus vividly demonstrate the perils of making an ad hoc determination of "control" or "financial stake."

A recent Tax Court opinion further illustrates the imprecision of the facts and circumstances approach. In *Cerone v. Commissioner,* No. 1683–80 (July 1, 1986), a father and son owned all the shares of a corporation formed to operate their restaurant. The corporation agreed to redeem all of the father's shares in order to resolve certain disagreements between the father and son concerning the management of the business. However, the father remained an employee of the corporation for at least five years after the redemption, drawing a salary of $14,400 for the first three years and less thereafter. The father claimed that he was entitled to capital gains treatment on the redemption because he had terminated his interest in the corporation within the meaning of section 302(b)(3).

Even on the facts of *Cerone,* the Tax Court refused to find that the father held a prohibited employment interest per se. Slip op. at 51–52 & n. 36. Instead, the Tax Court engaged in a lengthy analysis, citing both *Seda* and *Lynch.* The court proclaimed that *Lynch* reaffirmed the rationale of *Seda,* even though *Lynch* involved an independent contractor rather than an employee. After comparing the facts of *Seda* and *Cerone,* the Tax Court eventually concluded that the father in *Cerone* held a financial stake in the corporation because he had drawn a salary that was $2,400 per year more than the taxpayer in *Seda* and had been employed by the corporation for a longer period after the redemption. *Cerone,* slip op. at 53. However, the Tax Court was still concerned that prohibited interest in *Seda* might have been based on the finding in that case that the taxpayer had both a financial stake *and* continued control of the corporation. The Tax Court, citing *Lynch,* held that the "test is whether he retained a financial stake *or* continued to control the corporation." *Cerone,* slip op. at 54. Thus, the Tax Court found that the father in *Cerone* held a prohibited in-

terest because he had a financial stake as defined by *Seda.*

Although the Tax Court reached the correct result in *Cerone,* its approach undermines the definite contours of the safe harbor Congress intended to create with sections 302(b)(3) and 302(c)(2)(A)(i). Whether a taxpayer has a financial stake according to the Tax Court seems to depend on two factors, length of employment and the amount of salary. Length of employment after the redemption is irrelevant because Congress wanted taxpayers to know whether they were entitled to capital gains treatment on the date their shares were redeemed. *See* S.Rep. No. 1622, 83d Cong., 2d Sess. 235–36, *reprinted in* 1954 U.S.Code Cong. & Ad.News 4621, 4872–73. *See also* Treas.Reg. § 1.302–4(a)(1) (taxpayer must attach a statement disclaiming any interest in the corporation with the first tax return filed after the distribution). As for the amount of annual salary, the Tax Court's present benchmark appears to be the $12,000 figure in *Seda.* Salary at or above this level will be deemed to be a financial stake in the enterprise, though the $6,000 annual payments in this case were held not to be a financial stake. There is no support in the legislative history of section 302 for the idea that Congress meant only to prohibit service contracts of a certain worth, and taxpayers should not be left to speculate as to what income level will give rise to a financial stake.

In this case, the taxpayer points to the fact that the taxpayers in *Seda* and *Cerone* were employees, while he was an independent contractor. On appeal, the Commissioner concedes the taxpayer's independent contractor status. We fail to see, however, any meaningful way to distinguish *Seda* and *Cerone* from *Lynch* by differentiating between employees and independent contractors. All of the taxpayers performed services for their corporations following the redemption. To hold that only the employee taxpayers held a prohibited interest would elevate form over substance. The parenthetical language in section 302(c)(2)(A)(i) merely provides a subset of

prohibited interests from the universe of such interests, and in no way limits us from finding that an independent contractor retains a prohibited interest. Furthermore, the Tax Court has in effect come to ignore the parenthetical language. If employment relationships are not prohibited interests per se, then the taxpayer's status as an employee or independent contractor is irrelevant. What really matters under the Tax Court's approach is how the taxpayer fares under a facts and circumstances review of whether he has a financial stake in the corporation or managerial control.[7] Tax planners are left to guess where along the continuum of monthly payments from $500 to $1000 capital gains treatment ends and ordinary income tax begins.

Our holding today that taxpayers who provide post-redemption services have a prohibited interest under section 302(c)(2)(A)(i) is inconsistent with the Tax Court's decision in *Estate of Lennard v. Commissioner*, 61 T.C. 554 (1974). That case held that a former shareholder who, as an independent contractor, provided post-redemption accounting services for a corporation did not have a prohibited interest. The Tax Court found that "Congress did not intend to include independent contractors possessing no financial stake in the corporation among those who are considered as retaining an interest in the corporation for purposes of the attribution waiver rules." *Id.* at 561. We disagree. In the context of *Lennard*, the Tax Court appears to be using financial stake in the sense of having an equity interest or some other claim linked to the future profit of the corporation. Yet, in cases such as

*Seda* and *Cerone*, the Tax Court has found that fixed salaries of $12,000 and $14,400, respectively, constitute a financial stake. Fees for accounting services could easily exceed these amounts, and it would be irrational to argue that the definition of financial stake varies depending on whether the taxpayer is an employee or an independent contractor. In order to avoid these inconsistencies, we conclude that those who provide post-redemption services, whether as independent contractors or employees, hold an interest prohibited by section 302(c)(2)(A)(i) because they are more than merely creditors.

In addition, both the Tax Court and the Commissioner have agreed that taxpayers who enter into management consulting contracts after the redemption possess prohibited interests. *Chertkof v. Commissioner*, 72 T.C. 1113, 1124–25 (1979), *aff'd*, 649 F.2d 264 (4th Cir.1981); Rev.Ruling 70–104, 1970–1 C.B. 66 (1970). Taxpayers who provide such services are, of course, independent contractors. However, unlike the Commissioner's opinion in Rev. Ruling 70–104 that all management consulting agreements are prohibited interests, the Tax Court applies the financial stake or managerial control test. In *Chertkof*, the court found that because the services provided under the contract "went to the essence" of the corporation's existence, the taxpayer had not effectively ceded control. 72 T.C. at 1124. Here, the Tax Court distinguished *Chertkof* on the ground that the taxpayer did not retain control of the corporation, but instead provided only limited consulting services. *Lynch*, 83 T.C. at 608. We believe that any attempt to define prohibited

---

**7.** The Tax Court's focus on managerial control or a financial stake originated with Judge Simpson's concurrence in *Lewis*, 47 T.C. at 136–38. His interpretation of section 302(c)(2)(A) is supported by Bittker, *Stock Redemptions and Partial Liquidations Under the Internal Revenue Code of 1954*, 9 Stan.L.Rev. 13, 33 n. 72 (1956). Professor Bittker argues that Congress' goal was to ensure that taxpayers who transferred only ostensible control or maintained a financial stake in the corporation did not receive the benefit of capital gains treatment. He is no

doubt correct. However, the means selected by Congress to achieve this goal do not allow for an individualized determination of control and financial stakes. Instead, section 302(c)(2)(A)(i) operates mechanically: the taxpayer must sever all but a creditor's interest to avoid the family attribution rules and thereby receive capital gains treatment. Nowhere in the legislative history of section 302(c) does Congress intimate that courts may use a flexible facts and circumstances test to determine the existence of managerial control or a financial stake.

interests based on the level of control leads to the same difficulties inherent in making a case-by-case determination of what constitutes a financial stake.[8]

## IV

■ Our decision today comports with the plain language of section 302 and its legislative history. *See* Gardner & Randall, *Distributions in Redemption of Stock: Changing Definitions for a Termination of Interest*, 8 J. Corp. Tax'n 240, 247–48 (1981); Marusic, *The Prohibited Interest of I.R.C. Section 302(c)(2)(A)(i) After Seda and Lynch*, 65 Neb.L.Rev. 486, 502, 518–19 (1986); Rose, *The Prohibited Interest of Section 302(c)(2)(A)*, 36 Tax L.Rev. 131, 145–49 (1981). Taxpayers who wish to receive capital gains treatment upon the redemption of their shares must completely sever all noncreditor interests in the corporation.[9] We hold that the taxpayer, as an independent contractor, held such a noncreditor interest, and so cannot find shelter in the safe harbor of section 302(c)(2)(A)(i). Accordingly, the family attribution rules of section 318 apply and the taxpayer fails to qualify for a complete redemption under section 302(b)(3). The payments from the corporation in redemption of the taxpayer's shares must be characterized as a dividend distribution taxable as ordinary income under section 301.

REVERSED.

**8.** Determining the existence of control is particularly difficult in the context of a family-held corporation. The exercise of control often will not be obvious because a parent may influence a child, and hence corporate decisionmaking, in myriad ways. Our rule that the provision of services is a prohibited interest eliminates the need to make a speculative inquiry into whether the parent still controls the corporation after the redemption. Of course, no rule could or should prohibit post-redemption parent-child communication concerning the management of the corporation.

**9.** Our definition of a prohibited interest still leaves an open question as to the permissible scope of a creditor's interest under section 302(c)(2)(A)(i). *See, e.g.,* Treas.Reg. § 1.302–4(d) (a creditor's claim must not be subordinate

to the claims of general creditors or in any other sense proprietary, *i.e.,* principal payments or interest rates must not be contingent on the earnings of the corporation).

The taxpayer argues that some creditor relationships might result in an "opportunity to influence" as great or greater than any officer, director, or employee relationship. He cites Rev.Ruling 77–467, 1977–2 C.B. 92 which concluded that a taxpayer who leased real property to a corporation, after the corporation redeemed his shares, held a creditor's interest under section 302(c)(2)(A)(i). While the taxpayer here may be correct in his assessment of a creditor's "opportunity to influence" a corporation, he overlooks the fact that Congress specifically allowed the right to retain such an interest.