124 T.C. No. 2

UNITED STATES TAX COURT

RICHARD E. AND MARY ANN HURST, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15792-02.                    Filed February 3, 2005.

In 1997, as part of their retirement planning, Ps
sold their stock in R Corp. to H Corp.  H Corp.
redeemed 90 percent of P-husband's stock in H Corp.,
and P-husband sold the remainder to his son and two
third parties.  Both the redemption and stock sales
provided for payment over 15 years and were secured by
the shares of stock being redeemed or sold.  Ps
continued to own H Corp.'s headquarters building, which
they leased back to H Corp.  P-wife continued to be an
employee of H Corp. after the redemption, and she and
her husband continued to receive medical insurance
through her employment.  All the agreements--stock
purchase and redemption, lease, and employment
contract--were cross-collateralized by P-husband's H
Corp. stock and contained cross-default provisions.

<u>Held</u>:
     1.  The sale and redemption of the H Corp. stock
qualifies as a termination redemption under sec.

302(b)(3), I.R.C. None of the cross-default and cross-collateralization provisions made P-husband's post-transaction interest one "other than an interest as a creditor."

2. R's contention that Ps' sale of their R Corp. stock should be analyzed under sec. 304's rules governing sales of stock between corporations under common control must be rejected for lack of evidence because it was raised only in posttrial briefing and is a "new matter" rather than a "new argument."

3. P-wife is a "2-percent shareholder" under section 1372, I.R.C., because the rules of section 318, I.R.C., attribute to her the ownership of the H Corp. stock of both her husband and son during 1997; accordingly, the H Corp. health insurance premiums are includible in her income, subject to a deduction of a percentage of their amount under section 162(l)(1)(B), I.R.C.

Terry L. Zabel, for petitioners.

Bryan E. Sladek, for respondent.

HOLMES, Judge: Richard Hurst founded and owned Hurst Mechanical, Inc. (HMI), a thriving small business in Michigan that repairs and maintains heating, ventilating, and air conditioning (HVAC) systems. He bought, with his wife Mary Ann, a much smaller HVAC company called RHI; and together they also own the building where HMI has its headquarters.

When the Hursts decided to retire in 1997, they sold RHI to HMI, sold HMI to a trio of new owners who included their son, and remained HMI's landlord. Mary Ann Hurst stayed on as an HMI employee at a modest salary and with such fringe benefits as health insurance and a company car.

The Hursts believe that they arranged these transactions to enable them to pay tax on their profit from the sale of HMI and RHI at capital gains rates over a period of fifteen years. The Commissioner disagrees.

FINDINGS OF FACT

The Hursts were married in 1965, and have two children. Mr. Hurst got his first job in the HVAC industry during high school, working as an apprentice in Dearborn. He later earned an associate's degree in the field from Ferris State College. After serving in the military, he moved back to Detroit, and eventually gained his journeyman's card from a local union. In 1969, he and his wife made the difficult decision to move their family away from Detroit after the unrest of the previous two years, and they settled in Grand Rapids where he started anew as an employee of a large mechanical contractor.

In April 1979, the Hursts opened their own HVAC business, working out of their basement and garage. Mr. Hurst handled the technical and sales operations while Mrs. Hurst did the bookkeeping and accounting. The business began as a proprietorship, but in November of that year they incorporated it under Michigan law, with Mr. Hurst as sole shareholder of the new corporation, named Hurst Mechanical, Inc. (HMI). In 1989, HMI elected to be taxed under subchapter S of the Code, and that election has never

changed.[1]  The firm grew quickly, and after five years it had
about 15 employees; by 1997, it had 45 employees and over $4
million in annual revenue.

After leaving the Hursts' home, HMI moved to a converted
gas station, and then to a building in Comstock Park, Michigan.
When the State of Michigan bought the Comstock Park building in
the mid-1990s, the company moved again to Belmont, Michigan, in a
building on Safety Drive.  The Hursts bought this building in
their own names and leased it to HMI.  In early 1994, the Hursts
bought another HVAC business, Refrigerator Man, Inc., which they
renamed R.H., Inc. (RHI).  Each of the Hursts owned half of RHI's
stock.

In 1996, with HMI doing well and settled into a stable
location, the Hursts began thinking about retirement.  Three
employees had become central to the business and were to become
important to their retirement plans.  One was Todd Hurst, who had
grown up learning the HVAC trade from his parents.  The second
was Thomas Tuori.  Tuori was hired in the mid-1980s to help Mary
Ann Hurst manage HMI's accounting, and by 1997 he was the chief
financial officer of the corporation.  The last of the three was
Scott Dixon, brought on in 1996, after Richard Hurst came to
believe that HMI was big enough to need a sales manager.  Dixon

---

[1]  All references to sections and the Code are to the
Internal Revenue Code in effect for 1997, unless otherwise noted.

anticipated the potential problems posed by the Hursts' eventual retirement so, before joining the firm, he negotiated an employment contract that included a stock option. His attorney also negotiated stock option agreements for Tuori and Todd Hurst at about the same time. These options aimed to protect Dixon and the others if HMI were sold.

In late 1996, Richard Hurst was contacted by Group Maintenance American Corporation (GMAC). GMAC was an HVAC consolidator--a company whose business plan was to buy small HVAC businesses and try to achieve economies of scale--and it offered to buy HMI for $2.5 million. Mr. Hurst told Tuori, Dixon, and Todd about GMAC's offer, and they themselves confirmed it--only to learn that GMAC had no interest in keeping them on after a takeover. Convinced they were ready to run the business, they approached Mr. Hurst in May 1997 with their own bid to buy his HMI stock, matching the $2.5 million offered by GMAC. Mr. Hurst accepted the offer, confident that the young management team he had put together would provide a secure future for the corporation he had built up over nearly twenty years.

Everyone involved sought professional advice from lawyers and accountants who held themselves out as having expertise in the purchase and sale of family businesses. The general outline of the deal was soon clear to all. The Hursts would relinquish control of HMI and RHI to Tuori, Dixon, and Todd Hurst, and

receive $2.5 million payable over fifteen years.  HMI, Inc. would continue to lease the Safety Drive property from the Hursts.  The proceeds from the sale of the corporations and the rent from the lease would support the Hursts during their retirement.  Mrs. Hurst would continue to work at HMI as an employee, joining the firm's health plan to get coverage for herself and her husband.  Tuori, Dixon, and Todd Hurst would own the company, getting the job security they would have lacked had HMI been sold.

Everything came together on July 1, 1997:  HMI bought 90 percent of its 1000 outstanding shares from Mr. Hurst for a $2 million note.  Richard Hurst sold the remaining 100 shares in HMI to Todd Hurst (51 shares), Dixon (35 shares), and Tuori (14 shares).  The new owners each paid $2500 a share, also secured by promissory notes.  HMI bought RHI from the Hursts for a $250,000 note.[2]  (All these notes, from both HMI and the new owner, had an interest rate of eight percent and were payable in 60 quarterly installments.)  HMI also signed a new 15-year lease for the Safety Drive property, with a rent of $8,500 a month, adjusted for inflation.  The lease gave HMI an option to buy the building from the Hursts, and this became a point of some contention-- described below--after the sale.  And, finally, HMI also signed a

---

[2] Trial testimony amply demonstrated that an extra $25,000 loan repayment was mistakenly included in the sale price of RHI, and the Commissioner now agrees that RHI's price was $250,000.

ten-year employment contract with Mrs. Hurst, giving her a small salary and fringe benefits that included employee health insurance.

If done right, the deal would have beneficial tax and nontax effects for the Hursts. From a tax perspective, a stock sale would give rise to long-term capital gain, taxed at lower rates than dividends.[3] And by taking a 15-year note, rather than a lump sum, they could qualify for installment treatment under section 453, probably letting them enjoy a lower effective tax rate.

There were also nontax reasons for structuring the deal this way. HMI's regular bank had no interest in financing the deal, and the parties thought that a commercial lender would have wanted a security interest in the corporations' assets. By taking a security interest only in the stock, the Hursts were allowing the buyers more flexibility should they need to encumber corporate assets to finance the business.

But this meant that they themselves were financing the sale. And spreading the payments over time meant that they were faced with a lack of diversification in their assets and a larger risk

---

[3] This was an important consideration to the Hursts-- although HMI was an S corporation at the time of these transactions, and thus subject only to a single tier of tax, secs. 1363, 1366, it had been a C corporation until 1989 and still had $383,000 in accumulated earnings from those years that had not been distributed to Mr. Hurst. Without careful planning, these earnings might end up taxed as dividends under section 1368(c).

of default.  To reduce these risks, the parties agreed to a complicated series of cross-default and cross-collateralization provisions, the net result of which was that a default on any one of the promissory notes or the Safety Drive lease or Mrs. Hurst's employment contract would constitute a default on them all. Since the promissory notes were secured by the HMI and RHI stock which the Hursts had sold, a default on any of the obligations would have allowed Mr. Hurst to step in and seize the HMI stock to satisfy any unpaid debt.

As it turned out, these protective measures were never used, and the prospect of their use seemed increasingly remote.  Under the management of Todd Hurst, Dixon, and Tuori, HMI boomed.  The company's revenue increased from approximately $4 million annually at the time of the sale to over $12 million by 2003. Not once after the sale did any of the new owners miss a payment on their notes or the lease.

The Hursts reported the dispositions of both the HMI and RHI stock on their 1997 tax return as installment sales of long-term capital assets.  The Commissioner disagreed, and recharacterized these dispositions as producing over $400,000 in dividends and over $1.8 million in immediately recognized capital gains.  In the resulting notice of deficiency for the Hursts' 1997 tax year, he determined that this (and a few much smaller adjustments) led to a total deficiency of $538,114, and imposed an accuracy-

related penalty under section 6662 of $107,622.80.  The Hursts
were Michigan residents when they filed their petition, and trial
was held in Detroit.

OPINION

Figuring out whether the Hursts or the Commissioner is right
requires some background vocabulary.  In tax law, a corporation's
purchase of its own stock is called a "redemption."  Sec. 317(b).
The Code treats some redemptions as sales under section 302, but
others as a payment of dividends to the extent the corporation
has retained earnings and profits, with any excess as a return of
the shareholder's basis, and any excess over basis as a capital
gain.  Distributions characterized as dividends, return of basis,
or capital gains are commonly called "section 301 distributions,"
after the Code section that sets the general rules in this area.

The rules for redemptions and distributions from S corpora-
tions, which are found in section 1368 and its regulations, add a
layer of complexity, especially when the corporation has accumu-
lated earnings and profits (as both HMI and RHI did).  These
rules require computation of an "accumulated adjustments ac-
count," an account which tracks the accumulation of previously
taxed, but undistributed, earnings of an S corporation.  Distri-
butions up to the amount of the accumulated adjustments account
are generally tax free to the extent they do not exceed a share-

holder's basis in his stock.  (Some of the Hursts' proceeds from their sales of their stock benefited from these rules, but that was not a point of contention in the case.)

For much of the Code's history (including 1997), noncorporate sellers usually preferred a redemption to be treated as a sale because that offered the advantage of taxation at capital gains rates and the possible recognition of that gain over many years under section 453's provisions for installment sales.  This preference led to increasingly elaborate rules for determining which redemptions qualify as sales and which are treated as dividends or other section 301 distributions.  The Code has three safe harbors:  redemptions that are substantially disproportionate with respect to the shareholder, sec. 302(b)(2); redemptions that terminate a shareholder's interest, sec. 302(b)(3); and redemptions of a noncorporate shareholder's stock in a corporation that is partially liquidating, sec. 302(b)(4).  Each of these safe harbors comes with its own regulations and case law.

The Code also allows redemption treatment if a taxpayer can meet the vaguer standard of proving that a particular redemption is "not essentially equivalent to a dividend."  Sec. 302(b)(1).  The relevant regulation notes that success under this standard turns "upon the facts and circumstances of each case."  Sec. 1.302-2(b), Income Tax Regs.

Given the stakes involved, the Hursts and their advisers tried to steer this deal toward the comparatively well-lit safe harbor of section 302(b)(3)--the "termination redemption." Reaching their destination depended on redeeming the HMI stock in a way that met the rules defining complete termination of owner- ship. And one might think that a termination redemption would be easy to spot, because whether a taxpayer did or didn't sell all his stock looks like a simple question to answer. Congress, however, was concerned that taxpayers would manipulate the rules to get the tax benefits of a sale without actually cutting their connection to the management of the redeeming corporation. The problem seemed especially acute in the case of family-owned businesses, because such businesses often don't have strict lines between the roles of owner, employee, consultant, and director.

The Code addresses this problem by incorporating rules attributing stock ownership of one person to another (set out in section 318) in the analysis of transactions governed by section 302. Section 318(a)(1)(A)(ii), which treats stock owned by a child as owned by his parents, became a particular obstacle to the Hursts' navigation of these rules because their son Todd was to be one of HMI's new owners. This meant that the note that Mr. Hurst received from HMI in exchange for 90 percent of his HMI stock might be treated as a section 301 distribution, because he

would be treated as if he still owned Todd's HMI stock--making his "termination redemption" less than "complete".

But this would be too harsh a result when there really is a complete termination both of ownership and control. Thus, Congress provided that if the selling family member elects to keep no interest in the corporation other than as a creditor for at least ten years, the Commissioner will ignore the section 318 attribution rules. Sec. 302(c)(2); sec. 1.302-4, Income Tax Regs.[4]

By far the greatest part of the tax at issue in this case turns on whether Richard Hurst proved that the sale of his HMI stock was a termination redemption, specifically whether he kept an interest "other than an interest as a creditor" in HMI. There are also two lesser questions--whether the Hursts can treat the sale of their stock in RHI, the smaller HVAC company, as a sale or must treat it as a section 301 distribution; and whether the Hursts owe tax on the health insurance premiums that HMI paid for Mrs. Hurst.

We examine each in turn.

---

[4] There are other requirements for a termination redemption to be effective, notably that a taxpayer has to file a timely election. Sec. 1.302-4, Income Tax Regs. Mr. Hurst filed such an election for his HMI stock, having received permission from the District Director to file it late.

A. Complete Termination of Interest in HMI

The Hursts' argument is simple--they say that Richard (who had owned all the HMI stock) walked completely away from the company, and has no interest in it other than making sure that the new owners keep current on their notes and rent. The Commissioner's argument is more complicated. While acknowledging that each relationship between the Hursts and their old company--creditor under the notes, landlord under the lease, employment of a nonowning family member--passes muster, he argues that the total number of related obligations resulting from the transaction gave the Hursts a prohibited interest in the corporation by giving Richard Hurst a financial stake in the company's continued success.

In analyzing whether this holistic view is to prevail, we look at the different types of ongoing economic benefits that the Hursts were to receive from HMI: (a) The debt obligations in the form of promissory notes issued to the Hursts by HMI and the new owners, (b) their lease of the Safety Drive building to HMI; and (c) the employment contract between HMI and Mrs. Hurst.

1. Promissory Notes

There were several notes trading hands at the deal's closing. One was the $250,000 note issued by HMI to the Hursts for their RHI stock. The second was the $2 million, 15-year note, payable in quarterly installments, issued to Mr. Hurst by HMI in

redemption of 90 percent (900 of 1000) of his HMI shares.  Mr. Hurst also received three 15-year notes payable in quarterly in- stallments for the remaining 100 HMI shares that he sold to Todd Hurst, Dixon, and Tuori.  All these notes called for periodic payments of principal and interest on a fixed schedule.  Neither the amount nor the timing of payments was tied to the financial performance of HMI.  Although the notes were subordinate to HMI's obligation to its bank, they were not subordinate to general creditors, nor was the amount or certainty of the payments under them dependent on HMI's earnings.  See Dunn v. Commissioner, 615 F.2d 578, 582-583 (2d Cir. 1980), affg. 70 T.C. 715, 726-727 (1978); Estate of Lennard v. Commissioner, 61 T.C. 554, 563 & n.7 (1974).  All of these contractual arrangements had cross-default clauses and were secured by the buyers' stock.  This meant that should any of the notes go into default, Mr. Hurst would have the right to seize the stock and sell it.  The parties agree that the probable outcome of such a sale would be that Mr. Hurst would once again be in control of HMI.

Respondent questions the cross-default clauses of the vari- ous contractual obligations, and interprets them as an effective retention of control by Mr. Hurst.  But in Lynch v. Commissioner, 83 T.C. 597 (1984), revd. on other grounds 801 F.2d 1176 (9th Cir. 1986), we held that a security interest in redeemed stock does not constitute a prohibited interest under section 302.  We

noted that "The holding of such a security interest is common in sales agreements, and * * * not inconsistent with the interest of a creditor." Id. at 610; see also Hoffman v. Commissioner, 47 T.C. 218, 232 (1966), affd. 391 F.2d 930 (5th Cir. 1968). Furthermore, at trial, the Hursts offered credible evidence from their professional advisers that these transactions, including the grant of a security interest to Mr. Hurst, were consistent with common practice for seller-financed deals.

2.   The Lease

HMI also leased its headquarters on Safety Drive from the Hursts. As with the notes, the lease called for a fixed rent in no way conditioned upon the financial performance of HMI. Attorney Ron David, who was intimately familiar with the transaction, testified convincingly that there was no relationship between the obligations of the parties and the financial performance of HMI. The transactional documents admitted into evidence do not indicate otherwise. There is simply no evidence that the payment terms in the lease between the Hursts and HMI vary from those that would be reasonable if negotiated between unrelated parties. And the Hursts point out that the IRS itself has ruled that an arm's-length lease allowing a redeeming corporation to use property owned by a former owner does not preclude characterization as a redemption. Rev. Rul. 77-467, 1977-2 C.B. 92.

The Commissioner nevertheless points to the lease to bolster his claim that Mr. Hurst kept too much control, noting that in 2003 he was able to persuade the buyers to surrender HMI's option to buy the property. Exercising this option would have let HMI end its rent expense at a time of low mortgage interest rates, perhaps improving its cashflow--and so might well have been in the new owners' interest. But the Hursts paid a price when the new owners gave it up. Not only did the deal cancel the option, but it also cut the interest rate on the various promissory notes owed to the Hursts from eight to six percent. So we think the Commissioner is wrong in implicitly asserting that the buyers should have engaged in every behavior possible that would be adverse to the elder Hursts' interest, and focus on whether the elder Hursts kept "a financial stake in the corporation or con-tinued to control the corporation and benefit by its operations." Lynch, 83 T.C. at 604. Ample and entirely credible testimony showed that the discussions about HMI's potential purchase of the Safety Drive location were adversarial: The Hursts as landlords wanted to keep the rent flowing, and the new owners wanted to reduce HMI's cash outlays. Though the Hursts kept their rents, the new owners did not give up the option gratuitously--making this a negotiation rather than a collusion.

3.  Employment of Mrs. Hurst

At the same time that HMI redeemed Mr. Hurst's stock and signed the lease, it also agreed to a ten-year employment contract with Mrs. Hurst.  Under its terms, she was to receive a salary that rapidly declined to $1000/month and some fringe benefits--including health insurance, use of an HMI-owned pickup truck, and free tax preparation.

In deciding whether this was a prohibited interest, the first thing to note is that Mrs. Hurst did not own any HMI stock. Thus, she is not a "distributee" unable to have an "interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor."  Sec. 302(c)(2)(A)(i).  The Commissioner is thus forced to argue that her employment was a "prohibited interest" for Mr. Hurst.  And he does, contending that through her employment Mr. Hurst kept an ongoing influence in HMI's corporate affairs.  He also argues that an employee unrelated to the former owner of the business would not continue to be paid were she to work Mrs. Hurst's admittedly minimal schedule.  And he asserts that her employment was a mere ruse to provide Mr. Hurst with his company car and health benefits, bolstering this argument with proof that the truck used by Mrs. Hurst was the same one that her husband had been using when he ran HMI.

None of this, though, changes the fact that her compensation and fringe benefits were fixed, and again--like the notes and lease--not subordinated to HMI's general creditors, and not subject to any fluctuation related to HMI's financial performance. Her duties, moreover, were various administrative and clerical tasks--some of the same chores she had been doing at HMI on a regular basis for many years. And there was no evidence whatsoever that Mr. Hurst used his wife in any way as a surrogate for continuing to manage (or even advise) HMI's new owners. Cf. Lynch, 801 F.2d at 1179 (former shareholder himself providing post-redemption services).

It is, however, undisputed that her employment contract had much the same cross-default provisions that were part of the lease and stock transfer agreements. The Commissioner questions whether, in the ordinary course of business, there was reason to intertwine substantial corporate obligations with the employment contract of only one of 45 employees. He points to this special provision as proof that the parties to this redemption contemplated a continuing involvement greater than that of a mere creditor.

In relying so heavily on the cross-default provisions of the Hursts' various agreements, though, the Commissioner ignores the proof at trial that there was a legitimate creditor's interest in the Hursts' demanding them. They were, after all, parting with a

substantial asset (the corporations), in return for what was in essence an IOU from some business associates. Their ability to enjoy retirement in financial security was fully contingent upon their receiving payment on the notes, lease, and employment contract. As William Gedris, one of the Hursts' advisers, credibly testified, it would not have been logical for Mr. Hurst to relinquish shares in a corporation while receiving neither payment nor security.

The value of that security, however, depended upon the financial health of the company. Repossessing worthless shares as security on defaulted notes would have done little to ensure the Hursts' retirement. The cross-default provisions were their canary in the coal mine. If at any point the company failed to meet any financial obligation to the Hursts, Mr. Hurst would have the option to retrieve his shares immediately, thus protecting the value of his security interest instead of worrying about whether this was the beginning of a downward spiral. This is perfectly consistent with a creditor's interest, and there was credible trial testimony that multiple default triggers are common in commercial lending.

We find that the cross-default provisions protected the Hursts' financial interest as creditors of HMI, for a debt on which they had received practically no downpayment, and the collection of which (though not "dependent upon the earnings of

the corporation" as that phrase is used in section 1.302-4(d), Income Tax Regs.) was realistically contingent upon HMI's continued financial health. The buyers likewise had a motivation to structure the transaction as they did--their inability to obtain traditional financing without unduly burdening HMI's potential for normal business operations. Even one of the IRS witnesses showed this understanding of Mr. Hurst's relationship to the new owners after the redemption--the revenue agent who conducted the audit accurately testified that Mr. Hurst was "going to be the banker and wanted his interests protected."

The number of legal connections between Mr. Hurst and the buyers that continued after the deal was signed did not change their character as permissible security interests. Even looked at all together, they were in no way contingent upon the financial performance of the company except in the obvious sense that all creditors have in their debtors' solvency.

Moreover, despite the Commissioner's qualms, we find as a matter of fact that Mr. Hurst has not participated in any manner in any corporate activity since the redemptions occurred--not even a Christmas party or summer picnic. His only dealing with HMI after the sale was when, as noted above, he dickered with the buyers over their purchase option on the Safety Drive property. These facts do not show a continuing proprietary stake or control of corporate management.

B.    Treatment of the RHI Sale

Analyzing the Hursts' disposition of their interest in the smaller HVAC company, RHI, turns out to be more complicated than analyzing the redemption of their HMI stock.  The notice of deficiency was clear in stating that the Commissioner was disallowing the Hursts' treatment of the HMI redemption as a sale because that sale was to a "related party."  And both the Hursts and the Commissioner understood this to mean that the disposition of Mr. Hurst's HMI stock implicated section 302(b)(3).  That's the way both parties approached trial preparation and then tried the case.  But the notice of deficiency cited no authority in disallowing capital gains treatment for the Hursts' sale of their RHI stock, simply including it as a disallowed subitem within the overall disallowance of Mr. Hurst's treatment of his HMI stock sale.  The Commissioner's answer did assert that "both petitioners retained prohibited interests, within the meaning of I.R.C. § 302(c)(2)(A), in the corporation referred to by petitioners as 'RH, Inc.'"  And though the answer makes no more specific allegation about Mr. Hurst's alleged "prohibited interest" in RHI, it does specifically allege that Mrs. Hurst had "an employment contract with that corporation, which is a prohibited interest."

The issue did not get much attention at trial, because the stipulated evidence showed that the answer simply got it wrong-- Mrs. Hurst's employment contract was with HMI, not RHI.  And

neither side showed that either of the elder Hursts had any continuing involvement in whatever business RHI had left. (Indeed, the trial left unclear what, if anything, was left of RHI by the time HMI bought it.)

Relying on section 302 alone to upset the Hursts' characterization of their RHI stock sale under these circumstances seemed mistaken for another reason: That section governs stock redemptions, and the RHI stock was sold to HMI, not redeemed by RHI. As already noted, the trial focused almost entirely on HMI, and the Hursts' continuing connection to it. Both parties seemed to assume that if the Hursts won the battle for treating the redemption of their HMI stock as a sale, they would win as well on RHI.

Now the Commissioner urges us to rely on a different section of the Code--section 304--to support his position on RHI. This section is a more promising ground for him, because it allows him to treat some stock sales to related corporations as redemptions under section 302. The problem, however, is that he raised section 304 for the first time only in his answering brief. The Hursts object to the introduction of an issue so late in the proceedings, invoking Aero Rental v. Commissioner, 64 T.C. 331 (1975), and Theatre Concessions v. Commissioner, 29 T.C. 754 (1958). Aero Rental and Theatre Concessions are part of a line of cases beginning at least with Nash v. Commissioner, 31 T.C.

569 (1958), in which we have refused to allow a party to raise an issue for the first time in posttrial briefing.[5]

To decide whether the Commissioner can do this so late in the game, we first outline our rules on putting issues in play. We then analyze section 304 as it might apply here to decide whether the Commissioner can rely on it.

1.  Raising Arguments and Issues After Trial

We begin by noting that we share the Hursts' dim view of raising an issue for the first time in a posttrial answering brief.  Numerous procedural safeguards built into the Code and our own rules are designed to prevent such late-in-the-day maneuvering.  Section 7522(a) requires the Commissioner to "describe the basis for" any increase in tax due in the notice of deficiency.  After a case in this Court has begun, Rule 142(a) places the burden of proof on the Commissioner "in respect of any new

---

[5] The Commissioner does argue that the Hursts must have known that section 304 applied because they both filed waivers of family attribution for their sale of RHI stock.  A close look at the waiver request shows, however, that it is based on the clearly faulty representation that RHI itself issued the $250,000 note in redemption of the RHI stock.  This appears, then, to be just a markup of the waiver request filed at the same time by Mr. Hurst for the actual redemption of his HMI stock.  Whether it was filed out of an abundance of caution by the Hursts' former adviser or out of a misunderstanding of the deal, it nowhere mentions the fact that RHI and HMI might be affected by section 304.  And, of course, the failure of the Commissioner even to raise this point at trial means that the Hursts didn't provide any explanation of their own.

matter, increases in deficiency, and affirmative defenses, pleaded in the answer."

The difficulty for the Hursts is that we do distinguish between new matters and new theories--"we have held that for respondent to change the section of the Code on which he relies does not cause the assertion of the new theory to be new matter if the section relied on is consistent with the determination made in the deficiency notice relying on another section of the Code." Barton v. Commissioner, T.C. Memo. 1992-118 (citing Estate of Emerson v. Commissioner, 67 T.C. 612, 620 (1977)), affd. 993 F.2d 233 (11th Cir. 1993). In short, a "new matter" is one that reasonably would alter the evidence presented. A "new theory" is just a new argument about the existing evidence and is thus allowed.

We therefore describe how section 304 works, how it might apply to the Hursts' sale of RHI, and most importantly whether it would alter the evidence the Hursts might reasonably have wanted and been able to introduce.

2. Section 304 and the Sale of the RHI Stock

As noted above, the best individual taxpayers can hope for when disposing of their stock is for it to be treated as a sale of a capital asset. But this might create an opportunity for a creative taxpayer in command of two companies to sell his stock in one to the other, gaining the benefit of sale treatment,

avoiding any tax on receiving a dividend, all without relinquishing effective ownership. Congress squelches this opportunity with section 304. It addresses both parent/child situations--the acquisition by a subsidiary of stock in the parent corporation that owns it, sec. 304(a)(2); and brother/sister situations--the acquisition of one corporation's stock by another when both are under common control, sec. 304(a)(1). The Commissioner contends that the RHI sale to HMI is one of the latter.

What makes this contention look more like a new theory, and less like a new matter, is the truth that sections 302 and 304 are linked--if section 304 applies to a stock sale, the consequence is that it is treated as a redemption under section 302 and its regulations. And so we begin with the text of section 304(a)(1):

> SEC. 304(a). Treatment of Certain Stock Purchases.--
>
> (1) Acquisition by Related Corporation (Other Than Subsidiary).--For purposes of sections 302 and 303, if--
>> (A) one or more persons are in control of each of two corporations, and
>>
>> (B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) in control,
>
> then * * * such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock.[6] * * *

---

[6] The Hursts argue that one reason the Commissioner's argu-
(continued...)

Section 304(b) then helpfully sets out six paragraphs, ten subparagraphs, and dozens of clauses and subclauses to explain section 304(a). If these weren't clear enough, there are also seven columns of single-spaced regulations. Secs. 1.304-1 through 1.304-5, Income Tax Regs. The result is a rococo fugue of tax law.[7]

To begin de-composing this fugue, we note that section 304(c) and section 1.304-5(b), Income Tax Regs., define "control," a term of critical importance in this case. The regulation tells us that in deciding whether section 304(a)(1) applies, we look to see if the taxpayers involved (1) control both the issuing and acquiring corporation, (2) transfer stock in the

---

[6](...continued)
ment should fail is that section 304 was amended effective June 8, 1997 and had a transition provision that exempted binding deals already reduced to writing even if not yet closed. However, the amending language that the Hursts cite did not affect the first sentence of section 304 quoted above, which has been in the Code and unchanged for a half century at least. See Internal Revenue Code of 1954, ch. 736, sec. 304, 68A Stat 89. It is this sentence that might affect the tax treatment of the RHI stock sale.

[7] There is a custom of referring to the interplay of section 302 and section 318's family attribution rules as a "baroque fugue," traceable to 1 Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.04[3] at 9-35 (7th ed. 2002) (so many points and counterpoints as to be a "baroque fugue"). See also W. Rands, "Corporate Tax: The Agony and the Ecstasy," 83 Neb. L. Rev. 39, 69 (2004) ("This provides some relief in class. We take a five minute break from our work to discuss whatever a 'fugue' is. Usually, most of us do not know, but occasionally a classical music enthusiast tries to enlighten us."). Adding section 304 makes the fugue rococo.

issuing corporation to the acquiring corporation for property, and then (3) still control the acquiring corporation thereafter. We also listen to section 304(c)(3) and section 1.304-5(a), Income Tax Regs., which tell us to look at section 318's attribution rules to determine who controls what under section 304. See Gunther v. Commissioner, 92 T.C. 39, 49 n.12 (1989), affd. 909 F.2d 291 (7th Cir. 1990).

In this case, RHI was the "issuing corporation" and HMI was the "acquiring corporation." Before the sale, RHI was owned entirely by Richard and Mary Ann Hurst. Under section 318(a)(1)(A)(i), a taxpayer is considered to own shares of stock held by his spouse. Thus, we treat HMI and RHI as being under common control, in that HMI was actually owned by Mr. Hurst and RHI was constructively owned by Mr. Hurst (since he actually owned 50 percent and the 50 percent his wife owned is constructively owned by him as well). Moreover, Mrs. Hurst also constructively controlled both corporations, in that her husband's 50-percent interest in RHI was attributed to her (thus putting her at 100-percent ownership) as was his 100-percent interest in HMI. Section 304(a)(1)(A) is met.

HMI also acquired the RHI stock in exchange for property, as the Code makes painfully clear by defining "property" to include "money". Sec. 317(a). The accompanying regulation helpfully clarifies that definition by including as "property" a

promise to pay money in the future.  Sec. 1.317-1, Income Tax Regs.  Thus, section 304(a)(1)(B) is met.

The next issue is whether the Hursts were in "control" of HMI (the "acquiring corporation") for section 304 purposes after the transaction as they were before.  Under section 318(a)(1)(A)(ii), a taxpayer constructively owns any stock owned by his children.  Thus, the Hursts are considered to own Todd's 51-percent interest in HMI.  As all three elements of section 1.304-5(b) are met, section 304(a) applies.

Because section 304(a) applies,

> determinations as to whether the acquisition is, by reason of section 302(b), to be treated as a distribution in part or full payment in exchange for the stock shall be made by reference to the stock of the issuing corporation. * * *

Sec. 304(b)(1).

The consequence of applying section 304 is thus to send us back to section 302, treating the Hursts' sale of their RHI stock to HMI as if it were a redemption by RHI.  For the Commissioner, this deemed redemption analysis under section 302(b) turns on the uncontested fact that Mrs. Hurst remained an employee of HMI after the sale.  He argues that HMI's purchase of RHI made RHI into an HMI subsidiary.  Section 1.302-4(c), Income Tax Regs., would then govern: "If stock of a subsidiary corporation is redeemed, section 302(c)(2)(A) shall be applied with reference to an interest both in such subsidiary corporation and its parent."

Thus, despite section 304(b)'s command to treat the RHI sale as a redemption by RHI, the Commissioner contends that post-sale employment by either RHI or HMI is a prohibited interest.

So far, so good, for the Commissioner. This analysis looks as if it is purely legal, and so only a new "theory". In analyzing the RHI sale under section 304, it seems, there is no different evidence that the Hursts could have introduced that would change the analysis.

But this is where the Commissioner's failure to raise the deemed redemption analysis before filing his answering brief begins to look less like a tardy-though-forgivable new theory, and more like an unforgivable-if-unaccompanied-by-evidence introduction of a new matter. The Commissioner may well be right that the Hursts' sale of their RHI stock couldn't steer into the safe harbor of section 302(b)(3). However, there are several other paragraphs of section 302(b), and if the Commissioner had raised his section 304 argument earlier, it seems likely that the Hursts would have counterpunched by exploring whether one of those other paragraphs would have helped their cause.

Consider, for example, section 302(b)(1), which allows for exchange treatment of a redemption not essentially equivalent to a dividend. In order to qualify for exchange treatment under this provision, a transaction needs to satisfy the "meaningful reduction * * * [in] proportionate interest" test set out in

United States v. Davis, 397 U.S. 301, 313 (1970). In this case, Mrs. Hurst did in fact experience a reduction in her constructive RHI interest, even after applying section 318's attribution rules, because her interest was reduced from 100 percent (her 50-percent interest plus Mr. Hurst's 50-percent interest) to 51 percent (her son's interest in RHI after the deal was done.[8]

To find that the 49-percent reduction in ownership was meaningful, we would then have "to examine all the facts and circumstances to see if the reduction was meaningful for the purposes of section 302." Metzger Trust v. Commissioner, 76 T.C. 42, 61 (1981), affd. 693 F.2d 459 (5th Cir. 1982). This would have allowed the trial to focus upon the practical differences, if any, which exist between a 51-percent interest and a 100-percent interest in RHI after the sale.

It is true that redemptions in which the 50-percent threshold is not passed will generally be considered essentially equivalent to a dividend. Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.05[3][d] at 9-41 (7th ed. 2002). Yet an exception exists when a threshold has been

---

[8] Under section 318(a)(2)(C), Todd Hurst's 51-percent ownership of HMI stock after the sale also makes him constructive owner of 51 percent of RHI. Section 318(a)(1)(A)(ii) then makes the elder Hursts constructive owners of 51 percent of RHI even after they actually sold all of it to HMI. See sec. 318(a)(5)(A).

passed which alters the practical control of the taxpayer under State corporate law. Id. ; see also Wright v. United States, 482 F.2d 600, 608-609 (8th Cir. 1973); Patterson Trust v. United States, 729 F.2d 1089, 1095 (6th Cir. 1984).

Due to the Commissioner's tardiness in raising the section 304 issue, the parties offered no evidence as to whether the passage from 100 percent to 51 percent passes any thresholds in Michigan corporate law that might affect RHI. The record is similarly bereft of indicators about the rights over RHI held by Todd Hurst, Tuori, and Dixon. At trial, Tuori and others did testify that corporate decisions at HMI were made by a majority vote of himself, Todd Hurst, and Dixon, and that 2-to-1 votes were regular occurrences. This issue was not fleshed out in the manner we assume counsel for each party would have, had they focused upon clarifying the section 304 issue, and we are thus at a loss to analyze how it would affect a proper section 302(b)(1) analysis.

At the end of this long digression through sections 304 and parts of section 302 not raised before or during trial, we need not reach any firm conclusion on the issue. It is enough to observe that raising section 304 in an answering brief is in this case not just making a new argument, but raising a new matter.

The Hursts' case thus ends up looking like Shea v. Commissioner, 112 T.C. 183 (1999). Here, as in Shea, there is an ob-

viously applicable law newly relied upon by the Commissioner to support a portion of the original deficiency. Id. at 197. Here, as there, "Respondent failed to offer any evidence that indicated that respondent considered the application of * * * [that law] in making his determination." Id. at 192. We thus view the lack of evidence on the section 304 question as the Commissioner's failure to meet his burden, and we do not rule against the Hursts on this issue.[9]

## C.   The Taxability of Mrs. Hurst's Medical Benefits

The final issue is the Commissioner's assertion that the cost of Mrs. Hurst's medical insurance paid by HMI is taxable to her. On this issue, the Commissioner is right. Under section 1372(a), an S corporation (and, remember, HMI elected to be an S corporation) is treated as a partnership, and any employee who is a "2-percent shareholder" is treated as a partner when it comes to deciding whether an employee fringe benefit (like an employer's share of health insurance premiums) is includible in his gross income. Amounts paid by a partnership to (or for the benefit of) one of its partners are called "guaranteed payments" un-

---

[9] The Commissioner also contends that the Hursts should have understood that section 304 was at issue, because "[t]he only legal theory upon which the respondent could have relied to disallow the installment sale or exchange treatment for the redemption of the RHI stock is I.R.C. § 304." Respondent's Response to Petitioner's Motion to Strike A Portion of Respondent's Brief par. 2. Our rules do not force taxpayers into such guesswork.

der section 707(c) of the Code, if they are made without regard
to the partnership's income.  Like a partner, a 2-percent share-
holder is required by section 61(a) to include the value of such
guaranteed payments in his gross income and is not entitled to
exclude them under the Code sections that otherwise allow the
exclusion of employee fringe benefits.  See Rev. Rul. 91-26,
1991-1 C.B. 184.

The only question left, then, is whether Mrs. Hurst is a "2-
percent shareholder."  Section 1372(b) defines the term:

> SEC. 1372(b). 2-Percent Shareholder Defined.--For
> purposes of this section, the term "2-percent sharehol-
> der" means any person who owns (or is considered as
> owning within the meaning of section 318) on any day
> during the taxable year of the S corporation more than
> 2 percent of the outstanding stock of such corporation
> * * *.

And Mrs. Hurst fits within the definition because through
her husband she was a 100-percent shareholder of HMI for
part of the year; through her son, she was a 51-percent
shareholder for the remainder.  Owning, even by attribution,
two percent "on any day during the taxable year of the S
corporation" would have sufficed.  Thus, the employer's cost
of her health insurance is clearly includible in her gross
income.

The Hursts are correct, however, that section 1372
gives Mrs. Hurst a deduction for a percentage of the health

insurance premiums that HMI paid on her behalf.  And in 1997, section 162(l)(1)(B) set that percentage at 40.[10]

To reflect the foregoing and incorporate other stipulated issues,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[10] The Commissioner also contends that the Hursts are liable for a penalty under section 6662--either for negligence under sections 6662(b)(1) and (c) or for substantial understatement un-der sections 6662(b)(2) and (d).  Because we find almost entirely in the Hursts' favor, there is no substantial understatement. The Hursts' partial victory on the  minor issue of calculating the taxable portion of Mrs. Hurst's medical insurance premiums showed no failure in reasonably complying with the Code on that score, either.  The penalty is not sustained.  See sec. 6664(c); sec. 1.6664-4(b)(1), Income Tax Regs.